## NORTON, EXECUTOR, *v.* WHITESIDE.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 55.   Argued November 4, 5, 1915.—Decided November 29, 1915.

A mere formal statement in the bill to the effect that the cause of
action is one arising under the Constitution and laws of the United
States does not suffice to give this court jurisdiction to review the
judgment of the Circuit Court of Appeals under § 241, Jud. Code—
it must appear that the suit really and substantially involves a dis-
pute or controversy respecting the validity, construction or effect
of some law of the United States upon the determination whereof
the result depends. *Hull v. Burr,* 234 U. S. 712.

Riparian rights attaching to property patented by the United States
are determined by the law of the State in which the land is situated.
*Hardin v. Jordan,* 140 U. S. 371.

The fact that both parties owning parcels of real estate bordering on
a navigable boundary river opposite to each other acquired the
property from the United States does not change or affect the rule
that riparian rights of the parties are to be determined by the law
of the respective States in which the properties are situated.

The provisions in the various ordinances and statutes relating to the
organization of the Northwest Territory referred to in the bill in
this case do not control the riparian rights enjoyed, under the law
of the State wherein the property is situated, by parties who acquired
the land from the United States within the limits of a State carved
out of such Territory.

Averments in a bill as to the general intent of Congress to preserve free navigation of the rivers within the Northwest Territory are unavailing to give jurisdiction to this court to review a judgment of the Circuit Court of Appeals in a case otherwise made final by § 128, Jud. Code, in the absence of any specific legislation of Congress influencing the determination of an asserted Federal question in regard to riparian rights.

The mere fact that Congress directed the improvement of a new channel in a navigable river does not destroy riparian rights existing under state law and create new ones under Federal law.

In this case as the riparian rights asserted by complainant existed, if at all, under the law of the State in which the property is situated and the determination of the issues did not involve the construction of the Constitution or of any law of the United States, but as the jurisdiction rested on diverse citizenship alone, the decree of the Circuit Court is final under § 128, Jud. Code, and this court has no jurisdiction to review it under § 241, Jud. Code.

Writ of error to review, 205 Fed. Rep. 5, dismissed.

THE facts, which involve the jurisdiction of this court under § 241, Judicial Code, to review a judgment of the Circuit Court of Appeals, and the finality of such judgment under § 128, Judicial Code, are stated in the opinion.

*Mr. Jed L. Washburn*, with whom *Mr. William D. Bailey*, *Mr. Oscar Mitchell*, and *Mr. Albert C. Gillette* were on the brief, for appellant.

*Mr. Luther C. Harris* and *Mr. Alfred Jaques*, with whom *Mr. Theo. T. Hudson* was on the brief, for appellee Whiteside.

*Mr. Daniel G. Cash* and *Mr. John B. Richards, Jr.*, for appellee Tallas, submitted.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The appellant, who was complainant below, as the owner of certain shore land abutting on a stretch of water

in or near the upper end or far corner of Lake Superior, from one point of view sued to quiet his title to the whole or a part of a certain island which had emerged from the waters in front of his land, or considered from the same point of view in a broader aspect, to protect his asserted riparian rights in the submerged land in front of his shore property. The defendants who are appellees were owners or possessors either of property on the opposite shore or of the whole or part of the emerged island, and the controversy resulted from a difference between the parties as to the character and extent of their riparian rights and as to the ownership of the island which had emerged in the stretch of water between the two shores. The District Court upheld the theory of the existence in the complainant of the riparian rights asserted by him and therefore awarded relief upon that basis except as to a portion of the emerged island as to which it gave no relief because in consequence of adverse possession by one of the defendants, it was considered there was an adequate remedy at law and consequently no right to equitable relief. 188 Fed. Rep. 356. On appeal the court below, not approving the full character or extent of the riparian rights asserted by the complainant and recognized by the trial court, reversed with directions to dismiss the bill (205 Fed. Rep. 5), and it is in consequence of an appeal from that decree that the case is now before us.

A motion to dismiss upon the ground that the decree appealed from is beyond our competency to review because made final under § 128 of the Judicial Code (36 Stat. 1133, c. 231) requires to be disposed of. To test its merits we must first ascertain whether the jurisdiction of the District Court was invoked solely on the ground of diverse citizenship. *St. Anthony's Church* v. *Pennsylvania R. R.*, 237 U. S. 575, 577, and cases cited. That taking the face of the bill from the point of view of mere form of statement, diverse citizenship was not the only ground

of jurisdiction relied upon is apparent since the bill besides diversity of citizenship alleged that the cause of action was one arising under the Constitution and laws of the United States. This, however, does not suffice to solve the question since it is settled that a mere formal statement to that effect is not enough to establish that the suit arises under the Constitution and laws of the United States but that it must appear that "it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of some law of the United States, upon the determination of which the result depends. And this must appear not by mere inference, but by distinct averments according to the rules of good pleading. . . ." *Hull* v. *Burr*, 234 U. S. 712, 720, and authorities there cited. Before coming to the text of the complaint, to understandingly test whether it fulfills these requirements we give the merest outline of the condition out of which the controversy grew and to which the complaint related.

The boundary line of Wisconsin under its enabling act, starting from a designated point, ran "through the center of Lake Superior to the mouth of the St. Louis River; thence up the main channel of said river to the first rapids in the same," etc. And the boundary line in one respect of Minnesota from the point where it intersected with the St. Louis River followed the main channel of that river "to and through Lake Superior, on the boundary line of Wisconsin and Michigan, until it intersects the dividing line between the United States and the British Possessions." From the point of intersection where it first becomes the boundary of the States of Wisconsin and Minnesota, in its flow towards Lake Superior, the St. Louis River approaches Lake Superior in the direction of a large bay or indentation therein. From one point of view the river at once leaving the fast land empties into and is immediately absorbed in this bay. From another

the river before it empties into the lake expands into a stretch of shallow water contained within the north or Minnesota shore upon which is Duluth and the south or Wisconsin shore upon which is the City of Superior, through which shallow stretch a tortuous but navigable channel curvingly continues to flow until by a passage through an intervening bar the river emptying into the bay merges its existence with that of the lake. We say tortuous channel because the banks on either side of the flange-like stretch of water are not symmetrical, but are indented with various bays of divergent shape and expanse, and the water itself is irregularly interspersed with islands or flats which deflect the channel we have described and cause it greatly to meander as it proceeds to its ultimate destination in the bay through the bar in question. It will thus be seen that the difference between the two points of view is this, that one treats the lake as embracing the expanded though shallow stretch of water in question, and the other considers the shallow stretch of water as a part of the river until the point is reached where, traversing the bar, the lake and river are completely and beyond room for any possible question united.

On the Minnesota or north shore of this shallow stretch of water the complainant owned land. The channel flowing through the stretch of water as it approached the complainant's land curved towards the Minnesota shore and therefore in passing in front of that land was nearer the north or Minnesota shore. In the stretch of water nearly opposite the complainant's land, but over towards the south or Wisconsin shore there was a large island known as Big Island, admittedly in the State of Wisconsin, owned by Whiteside, one of the defendants, and about two thousand feet lay between the outer shore of this island and the complainant's land on the northern shore. In the intervening space between the channel and this

island, and therefore on the south or Wisconsin side of the channel, there gradually emerged a smaller island.

It having been determined to improve the navigation in the channel through the stretch of water in question, the plans to accomplish that purpose were approved by the Secretary of War in 1899, and in virtue of an appropriation by Congress the work under the plans was carried out by the United States between the years 1899 and 1902. It is not necessary for the elucidation of the averments of the bill to do more than say that the carrying out of this work resulted in the creation of a new navigable channel which in passing through the stretch of water instead of swinging towards the north or Minnesota shore in front of the complainant's land curved in the other direction and therefore approached nearer the Wisconsin shore than did the old channel. In doing so it consequently reached or struck the emerged island of which we have spoken near its Wisconsin or south side, and cutting through it virtually put the new and enlarged channel on the Wisconsin side of such emerged island. What remained of the island thereafter hence lay between the newly created channel and the lands of the complainant on the north or Minnesota shore. In other words, as the result of the creation of the new channel the lands of the complainant to the extent that the emerged island accomplished that result, were separated from the new channel. In the performance of the work it may be conceded that in cutting through the emerged or small island the excavated earth was largely dumped on the surface of the island towards the Minnesota shore and that either because of the washing of this earth into the old channel or the sedimentary deposit caused by the slackening of the velocity of the water flowing through it, the old channel opposite the land of the complainant became not suitable for, or more difficult of, navigation.

In view of this situation we come to consider the bill,

its averments and the light thrown on them by the relief prayed in order to determine whether in any substantial manner whatever it involved the construction or application of the Constitution or laws of the United States within the criteria embraced by the established rule which we at the outset stated. Instead of following the order of the twenty-four paragraphs which the bill contains, we rearrange and group them under five headings, omitting many redundancies of statement, but leaving out nothing which can throw light upon the cause of action relied upon.

(a) *The parties.* The complainant was alleged to be a citizen of Kentucky and the defendants, Whiteside, Alexander and Tallas, were alleged to be citizens of the State of Minnesota and inhabitants of the district in which the suit was brought.

(b) *The grievances complained of.* It was alleged that the complainant owned land under patents from the United States on the Minnesota side of the stretch of water at the point to which we have referred, that the defendant, Whiteside, under title acquired also from the United States, owned land on the Wisconsin side, Big Island, that Alexander, either in his own right or in connection with Whiteside, claimed some land on the Wisconsin side and resulting riparian rights, and that Tallas had taken possession of a part of the small or emerging island, erected a small structure thereon and without right in law was asserting ownership therein, the land never having been disposed of by public authority. It was averred that both Whiteside and Alexander by virtue of their shore ownership were asserting riparian rights crossing the new or government channel to the old or original channel embracing what remained of the emerged island and that Tallas by virtue of his possession of the island which remained was asserting the right to hold it as owner.

(c) *The rights asserted.* Averring that the stretch of water was a part of Lake Superior, in substance it was

asserted that as the complainant owned shore land on the Minnesota side there existed riparian rights extending out to the center of the channel flowing through the stretch of water, securing to the shore owner the consequent right of direct access to such channel and this right it was in substance alleged embraced the power not only to extend to the old channel, but to the new navigable channel constructed in improvement of navigation by the United States and to enjoy riparian rights coterminous therewith, and that therefore the asserted rights by Whiteside, Alexander and Tallas were in conflict with such right upon the part of the complainant and cast a cloud upon his title giving him the right to equitable relief.

(d) *The legal grounds asserted as the basis of the relief prayed.* The bill alleged the historical fact of the original ownership by Virginia of the territory in which the lands in controversy were embraced, of its passing to the Confederation as a part of the vast domain ceded by Virginia, of the adoption of the Northwest Territory Ordinance in 1787, the stipulation contained in that ordinance that "the navigable waters leading into the Mississippi and St. Lawrence rivers, . . . shall be common highways and forever free as well to the inhabitants of said Territory as to the citizens of the United States and those of other States that may be admitted into the Confederacy, without any tax, impost or duty therefor." The bill further referred to the act of Congress of May, 1796, providing for the sale of lands within the Northwest Territory, including the lands in question, reciting the provision therein "that all navigable rivers within the territory to be disposed of by virtue of this act, shall be deemed to be and remain public highways and that in all cases where the opposite banks of any stream, not navigable, shall belong to different persons, the stream and the bed thereof shall become common to both." It alleged the subsequent carving out of said territory of the States of Ohio, Indiana, Mich-

igan, Wisconsin and part of Minnesota and the reservation in the Enabling Acts preserving the navigable waters bordering upon the same as common highways and extending concurrent jurisdiction to the States bordering thereon. Proceeding, the bill alleged the boundaries of the two States of Wisconsin and Minnesota as stated in the Enabling Acts to which we have referred, including the line of the main channel of the St. Louis River and the center of Lake Superior at the points and as described in the statement which we have previously made. It alleged that under the laws of Minnesota the riparian rights extending to the center of the main navigable channel were valid as asserted by the complainant and in practice had been recognized by the exercise of taxing and other powers. So far as the United States was concerned, growing out of the averments as to the formation of the Northwest Territory and of the States just referred to, it was alleged:

"That in the preservation of public rights on such navigable waters, where the same constitute state boundaries, it was the intent of the Federal Government and of the States to forever maintain and preserve the rights of the respective States and the citizens thereof, to have access to the navigable and navigated channels of such boundary waters and among the most ancient and important rights of private owners, incidental to the ownership of the shore lands abutting upon such boundary waters, is the right to wharf out to and have access to the navigable and navigated channel of such waters from such shore lands, and to have connection from such shore lands, throughout the extent thereof, with commerce upon such navigable and navigated part or channel of such waters, subject always to the paramount control over the whole of such waters by the United States."

It was charged that the emerging of the small island opposite the land of the complainant had occurred after

the survey, sale and patent of complainant's land by the United States. In addition the bill charged that under the power of the United States to regulate commerce, harbor lines had at various times been established which extended from the respective shores to the old channel before the new one was constructed and that under the plans approved by the Secretary of War for the new work it was contemplated that harbor lines should extend from the respective shores to that channel.

(e) *The relief prayed.* The prayer was that the riparian rights of the complainant be recognized and enforced from the shore out to the new navigable channel created by the work done by the United States, and that all rights of the defendants as riparian owners which they asserted to extend across the new channel over to the old channel be declared to be invalid and that they be restrained from asserting or enforcing them.

Coming to test these averments we fail to perceive any ground for holding that the rights asserted rested in any degree whatever upon a substantial claim under the Constitution or laws of the United States or by any possibility involved the construction or application of any law of the United States for the following reasons: *First,* because as to the claim of riparian rights on the navigable waters in question it was long since affirmatively settled that such claim solely involves a question of state law and therefore at the time the bill was filed it was not open to contend to the contrary. *Barney* v. *Keokuk,* 94 U. S. 324; *Hardin* v. *Jordan,* 140 U. S. 371; *Grand Rapids & Ind. R. R.* v. *Butler,* 159 U. S. 87; *Devine* v. *Los Angeles,* 202 U. S. 313. *Second,* because the mere fact that both parties, the one holding on the Wisconsin shore and the other on the Minnesota shore, had acquired the property by them held from the United States, it is also affirmatively settled, in no way changes the situation. *Blackburn* v. *Portland Mining Co.,* 175 U. S. 571; *Florida Central &c. R. R.* v.

*Bell,* 176 U. S. 321; *Shoshone Mining Co.* v. *Rutter,* 177
U. S. 505; *Shulthis* v. *McDougal,* 225 U. S. 561, 569.
*Third,* because so far as the references in the bill to the
organization of the Northwest Territory and to the
various provisions relating to navigable waters are con-
cerned, however interesting they may be historically, we
can see not the slightest ground for the contention that
they were controlling or in any way could influence the
question of the nature and character of the riparian rights
enjoyed under the state law by the complainants. *Fourth,*
because we can discover in the averments of the bill no
substantive statement indicating that it was contended
to the contrary, unless it be that such purpose could be
implied as the result of the general averments of the bill
which we have quoted concerning the general intent of
Congress to preserve free navigation. But if we were to
indulge in such assumption the result would not be dif-
ferent, as the averments in question make no reference
to any specific legislation of Congress which would have
the slightest influence upon the determination of the
existence of the riparian rights which the bill asserted.
*Fifth,* because we are clearly of the opinion that the mere
fact that Congress in the exercise of its power to improve
navigation directed the construction of the new channel
affords no basis whatever for the assumption that thereby
as a matter of Federal law rights of property, if secured
by the state law, were destroyed and new rights of prop-
erty under the assumption indulged in incompatible with
that law were bestowed by Congress. And especially are
we constrained to this view by the fact that there is no
question here of any interference with work done by the
United States under its paramount authority to improve
navigation or any attempt to render the result of that
work inefficacious. This will be lucidly illustrated by
considering for a moment the action of both the courts
below, since neither questioned the paramount authority

and right of the United States in aid of navigation to construct the new channel or concerned themselves with any real or imaginary impediment to navigation. This is at once demonstrated by considering that the only difference between the two was the conclusion in the trial court that the effect of constructing the new channel was to extend the riparian rights over and across the old channel to the new, irrespective of the rights of property changed or destroyed thereby, because the new channel was to be treated not as a new work but as the gradual and natural modification of the old, while the court below reached a directly contrary conclusion.

Finally we are of opinion that the question whether the stretch of water and the channel through it be treated as a part of Lake Superior as asserted by the complainant, or be considered at the point in issue as a mere continuation of the St. Louis River as asserted by the defendants (a view held by both the courts below), is wholly negligible for the purpose of determining whether a substantial Federal question was alleged justifying our taking jurisdiction of the cause.

As from what we have said it results that our opinion is that there is no substantial ground for concluding that the jurisdiction of the District Court rested upon any assertion of Federal right, irrespective of diverse citizenship, justifying our review of the court below, it follows that the appeal must be and it is

*Dismissed for want of jurisdiction.*