METTLER, Appellant, v. AMES REALTY CO., Respondent.

(No. 4,475.)

(Submitted September 22, 1921. Decided October 24, 1921.)

[201 Pac. 702.]

*Waters and Water Rights—Riparian Rights—Doctrine of Appropriation — Principles — Injunction — Complaint — Insufficiency.*

Waters—Common-law Doctrine of Riparian Rights—Extent of Rights.
1.   Under the common-law doctrine of riparian rights, the right to the use and flow of waters of a stream in its accustomed channel is an inherent incident to the ownership of the riparian lands, a right annexed to the soil, not as an easement or appurtenance, but as a part and parcel of the land itself, and is not created by use or affected by disuse, and every riparian proprietor upon the same stream has the same right of reasonable use, the rights of each being qualified by the corresponding rights of the others.

Same—Riparian Rights—What Rights Paramount.
2.   As between riparian right claimants, the use of water for household and domestic use, drinking and watering livestock, is paramount to artificial uses, irrigation, and other industrial purposes.

Same—"Riparian Proprietor"—Definition.
3.   A riparian proprietor is one whose land borders upon a natural stream or through whose land such stream flows.

Same—Riparian Rights—Use of Water.
4.   Under the doctrine of riparian rights, a riparian owner cannot divert to nonriparian lands the water which he has a right to use upon riparian lands.

Same—Doctrine of Appropriation—Rights of Appropriator.
5.   Under the doctrine of appropriation the right to the use of the waters flowing in a natural stream is extended to riparian and nonriparian lands alike, it being immaterial whether the lands to which the waters are applied are within or without the watershed of the stream from which they are taken.

Same.
6.   An appropriator of water who has appropriated the entire flow of a stream may use all of it to the exclusion of riparian proprietors and junior appropriators, the only limitation imposed upon the extent of his appropriation being his needs and facilities for use.

2.   Meaning of phrase "domestic purposes" in relation to riparian rights, see notes in Ann. Cas. 1912B, 621; Ann. Cas. 1914D, 563.
4.   Nature of riparian rights and lands to which they attach, see notes in 9 Ann. Cas. 1235; 17 Ann. Cas. 829; Ann. Cas. 1913E, 709; Ann. Cas. 1915C, 1026; 41 L. R. A. 737.
6.   Respective rights of appropriators and riparian owners, see note in 43 Am. Dec. 269.

[61 Mont. 152.]

Same—Appropriation—Extent of Right.

7. If an appropriator's needs exceed the capacity of his distributing system, then the capacity of his means of diversion measures the extent of his right, and if the capacity of his distributing system exceeds his needs, then his needs limit the extent of his appropriation.

Same—Appropriation—First in Time, First in Right.

8. Priority of appropriation of water confers superiority of right, without reference to the character of the use, whether natural or artificial.

Same—Source of Right—Use of Water Subject to State Control.

9. An appropriator of water derives his right from the state and not from the national government, the use of waters flowing in natural streams in Montana being subject to state regulation and control.

Same—Appropriation may be Made from What Streams.

10. An appropriation of water is not confined to waters flowing in streams upon public land, but may be made from a stream flowing through privately owned land by invoking the aid of eminent domain proceedings, if necessary.

Same—Appropriation by Federal Government—Procedure.

11. Where the government of the United States desires to acquire the right to the use of waters flowing in natural streams in Montana, it must proceed as an individual to make an appropriation in compliance with the laws of the state.

Same—Injunction—Riparian Rights—Complaint—Insufficiency.

12. *Held,* that the common-law doctrine of riparian rights does not prevail, and has not prevailed in Montana since the enactment of the Bannack Statutes in 1865, but that the doctrine of appropriation does obtain and is controlling, and that therefore the complaint of an owner of agricultural land through which a stream was flowing in its natural channel the waters of which had been appropriated by defendant company and diverted so as to take all of them before they reached plaintiff's land, for an injunction asked for on the ground that, though not owning a water right on the stream, as riparian owner he was entitled to have such amount of the waters flow in the channel as was necessary for household purposes and for watering livestock, did not state a cause of action.

Appeal and Error—*Obiter Dictum* not Binding upon Court.

13. Observations made during the course of an opinion upon a subject not involved in the case do not require explanation and are not binding upon the court.

*Appeals from District Court, Lewis and Clark County; W. H. Poorman, Judge.*

ACTION by Anna E. Mettler against the Ames Realty Company. From judgment of dismissal and from order denying an injunction, plaintiff appeals. Judgment and order affirmed.

---

8. On right of prior appropriation of water, see comprehensive note in 30 L. R. A. 665.

12. Injunction as remedy for wrongful diversion of watercourse, see note in Ann. Cas. 1912D, 13.

*Messrs. Galen, Mettler & Toomey,* for Appellant, submitted a brief; *Mr. Frank W. Mettler* argued the cause orally.

The sole question raised by the complaint, as we view its allegations, is whether the defendant has a right as an appropriator of water to change its point of diversion, under the provisions of section 4842 of the Revised Codes, in derogation of the riparian rights of the plaintiff. In other words, there is no conflict between plaintiff and defendant as to the use of the waters of Prickly Pear Creek, but simply the question whether the plaintiff, as a riparian owner, comes within the protection of the excepting clause of section 4842, which permits such change only "if others are not thereby injured." It was contended by counsel for defendant in the lower court that this clause applied only to other appropriations of water, and that the doctrine of riparian rights having been absolutely abrogated, plaintiff had no rights whatsoever that need be respected by defendant when it changed its point of diversion as an appropriator.

It is true that the complaint alleges that "the waters flowing in the natural channel of the said creek for many years last past have been used by plaintiff and her predecessors in interest for domestic and stock-raising purposes." This use, however, is only incidental to the right of the plaintiff to have the waters of the creek flow down the natural channel. In other words, it is not the use by plaintiff of the waters for domestic and stock-raising purposes that is being interfered with by defendant's change of the point of diversion, but it is plaintiff's right to have the waters flow down the natural channel of the creek.

Most of the decided cases in which the question of the right to change the point of diversion has arisen have been those in which other appropriators have made complaint. The statute, however, does not confine its protection to other appropriators. In at least one case this court has declared the rule in practically the same language as found in the statute:

"A person entitled to the use of water may change the point of its diversion and may use it for other purposes than that for which it was originally appropriated, provided always, however, other parties are not injured thereby." (*Head* v. *Hale,* 38 Mont. 302, 100 Pac. 222.)

One who has acquired title to lands bordering on or traversed by a stream before any valid appropriation of its waters becomes invested with all the rights of a riparian proprietor and any subsequent appropriation must be subject to his riparian rights. (40 Cyc. 708, note 36.) Every riparian owner is entitled to the natural flow of the water of a running stream through or along his land in its accustomed channel, undiminished in quantity and unimpaired in quality, except as may be occasioned by the reasonable use of the stream by other like appropriators. (40 Cyc. 560, note 47; *Campbell* v. *Flannery,* 29 Mont. 246, 74 Pac. 450.)

This does not imply any ownership or property right in the flowing water itself, but merely a right to have it continue in its accustomed channel and volume and to make a beneficial use of it while passing over the land to such reasonable extent as will not impair its usefulness to other riparian proprietors. (40 Cyc. 560, notes 48, 49.)

In the lower court, the defendant contending that the doctrine of riparian rights has been absolutely abrogated in this state, cited in support of its contention, *Smith* v. *Denniff,* 24 Mont. 20, 81 Am. St. Rep. 408, 50 L. R. A. 741, 60 Pac. 398. An examination of this case, however, will disclose that the doctrine not only has not been abrogated, but that, on the contrary, it has been expressly and explicitly recognized. Almost the first proposition laid down by the court in the case is as follows: "The right to the use of running water is a corporeal right or hereditament which follows or is embraced by the ownership of riparian soil. It is a corporeal right running with riparian land."

It is true that in the course of its opinion the court uses language which indicates that there has been a modification of

the common-law rule as to riparian rights, by reason of our statutes for the appropriation of water. It is to be observed, however, with reference to such language, first, that it is explicitly stated to be by way of *obiter;* and second, that it is only the right to the use of the water by the riparian owner which has been modified by our doctrine of prior appropriation. As above stated the question of a possible conflict in use between a riparian owner and an appropriator is not necessarily involved in this case. It is the change of the point of diversion to the detriment of the riparian owner's right to have the water run through his land that is the gravamen of plaintiff's complaint.

As we read the case above cited, it declared that the very basis of the right to appropriate and use the waters of a stream by a nonriparian owner is a grant from some riparian owner, for it is said: "It is therefore apparent that absolute legal title to a water right can only be acquired by grant, express or implied, of the riparian owner of the land and water." The court in effect declares that while it is only by virtue of the statute of this state that an appropriation of water in derogation of the common-law rights of the riparian owner can be made, yet this very statute is subservient to those same riparian rights, for the court says: "But this privilege or right to appropriate the water of a stream can in any and every case be taken advantage of or exercised only by one who has riparian rights, either as owner of the riparian land or through grant of the riparian owner." How, then, can it be reasonably maintained that riparian rights have been abrogated in this state? As to the nonriparian owner the court says: "Of necessity he must acquire by grant, express or implied (or by condemnation under the power of eminent domain), from some riparian owner the right to exercise the statutory privilege."

The right of the defendant to change its point of diversion is conferred by the same statute (sec. 4842), which gave it the right to appropriate the water in the first instance. The right

to appropriate the waters being subject to, and in fact based upon, the riparian rights of the land owners on the creek, equally so, then, is the right to change the point of diversion subject to those same riparian rights. It follows that the riparian right of the plaintiff is within the protection of the statute, and no change in the point of diversion by defendant could be made to the injury of such right.

No appearance on behalf of Respondent.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

Prickly Pear Creek, a tributary of the Missouri River, flows through agricultural lands belonging to the plaintiff, and for many years plaintiff and her predecessors in interest have used such amount of the waters flowing in the creek as was necessary for household purposes and watering livestock. The defendant company also owns agricultural lands in the same vicinity, and, by virtue of an appropriation heretofore made, is entitled to use the waters from the same creek for irrigation purposes. Originally defendant diverted the waters used by it at a point on the creek below plaintiff's ranch, but on May 2, 1919, it changed the place of diversion to a point on the creek above plaintiff's lands, and since then has conveyed all of the waters of the creek around and away from plaintiff's ranch and upon its own lands, thereby depriving plaintiff of any use of the waters during the irrigation season of each year, and threatens so to continue diverting and using the water. These facts are set forth somewhat more in detail in the complaint, upon which an injunction *pendente lite* and a permanent injunction after trial was sought.

The lower court sustained a general demurrer to the complaint and denied the application for a temporary injunction. Plaintiff elected to stand upon her pleading, suffered a judgment of dismissal to be entered, and appealed therefrom and from the order denying the injunction.

Plaintiff does not claim that she has appropriated any of the waters of Prickly Pear Creek, and does not complain that defendant diverted more water than the amount of its appropriation.

It is axiomatic that, if plaintiff is not entitled to have the [1, 2] waters of Prickly Pear Creek flow down its natural channel through her land, she is not injured by the acts of the defendant in changing the place of diversion, and, if not injured, she cannot complain. But it is urged vigorously that, because of the relative situation of her land and the creek and her ready access to the water, plaintiff is entitled to assert the common-law doctrine of riparian rights under which every proprietor of land on the bank of a natural stream has an equal right to have the waters of the stream continue to flow in its natural course as it was wont to do, without diminution in quantity or deterioration in quality, except so far as either of these conditions may be affected by the reasonable use of the waters by upper riparian proprietors. Under that doctrine the right to the use and flow of the waters of a stream is an inherent incident to the ownership of riparian lands, a right annexed to the soil, not as an easement or appurtenance, but as part and parcel of the land itself (*Smith* v. *Denniff*, 24 Mont. 20, 81 Am. St. Rep. 408, 50 L. R. A. 741, 60 Pac. 398), and it follows from the very nature of the right that it is not dependent upon user to any extent. Use does not create it and disuse cannot affect it adversely. If the riparian proprietor does not care or need to use the waters, he still has the right to have them flow in their accustomed channel (*Lux* v. *Haggin*, 69 Cal. 255, 10. Pac. 674), though he cannot insist upon an absolute and exclusive right to the flow of all the waters in the stream, for every such riparian proprietor upon the same stream has the same right of reasonable use, and the right of each is qualified by the corresponding rights of the others. (*McEvoy* v. *Taylor*, 56 Wash. 357, 26 L. R. A. (n. s.) 222, 105 Pac. 851.) As between riparian right claimants, the use of water

for the so-called natural purposes, household and domestic use, drinking and watering livestock, is held to be paramount to artificial uses, irrigation and other industrial purposes. (*Smith* v. *Corbit,* 116 Cal. 587, 48 Pac. 725.)

Some confusion has arisen over the proper use of the term [3] "riparian," but there cannot be any occasion for it. A riparian proprietor is one whose land borders upon a natural stream or through whose land it flows. (Black's Law Dictionary.) The term "littoral" is used to characterize lands bordering upon a lake or the sea. (Bouvier's Law Dictionary.) Under this doctrine one who does not own any [4] land adjoining upon a stream cannot claim riparian rights and a riparian owner cannot exercise such rights in respect to lands which are not riparian. In other words, he cannot divert to nonriparian lands the water which he has a right to use upon riparian lands. (*Crawford Co.* v. *Hathaway,* 67 Neb. 325, 108 Am. St. Rep. 647, 60 L. R. A. 889, 93 N. W. 781.)

The doctrine of appropriation extends the right to the use [5–8] of the waters flowing in a natural stream to riparian and nonriparian lands alike (Long on Irrigation, sec. 125), and it is immaterial whether the lands to which the waters are applied are within or without the watershed of the stream from which the waters are taken (1 Wiel on Water Rights, sec. 363). Furthermore, this doctrine sanctions the right of an appropriator to the use of all the waters of a stream, to the exclusion of riparian proprietors and junior appropriators, if the entire flow of the stream has been appropriated by him (Long on Irrigation, sec. 132), and the only limitations imposed upon the extent of his appropriation are his needs and facilities for use. If his needs exceed the capacity of his distributing system, then the capacity of his means of diversion measures the extent of his right. If the capacity of his distributing system exceeds his needs, then his needs limit the extent of his appropriation. (*Bailey* v. *Tintinger,* 45 Mont. 154, 122 Pac. 575.) Another rule peculiar to the doc-

trine of appropriation as distinguished from the doctrine of riparian rights, finds expression in the maxim, "First in time, first in right," or, in other words, priority of appropriation confers superiority of right (1 Wiel on Water Rights, sec. 299), and that, too, without reference to the character of the use, whether natural or artificial (*Id.*, sec. 378).

In California a dual system of water right law has been [9–12] recognized almost from the time of the first settlement after the gold discovery. The common-law doctrine of riparian rights, modified from time to time to suit natural conditions, has been applied wherever the lands have been reduced to private ownership, except as against rights acquired by prior appropriation while the lands were a part of the public domain; and the doctrine of appropriation has been applied to waters upon the lands belonging to the state or to the United States. The California rule has been followed, in whole or in part, by Oregon, Washington, North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, and Texas. Colorado early rejected the common-law doctrine as unsuited to the natural conditions in that state and adopted the doctrine of appropriation as providing the only means for securing the right to use water for agricultural, mining, and other beneficial purposes, and that rule has been followed generally in Arizona, Idaho, New Mexico, Utah, Wyoming, and in Nevada since the decision in *Vansickle* v. *Haines*, 7 Nev. 249, was overruled in *Jones* v. *Adams*, 19 Nev. 78, 3 Am. St. Rep. 788, 6 Pac. 442, and in *Reno S. M. & R. Works* v. *Stevenson*, 20 Nev. 269, 19 Am. St. Rep. 364, 4 L. R. A. 60, 21 Pac. 317.

Controversies between appropriators and riparian proprietors without appropriations have given rise to almost endless litigation in the western states. Numerous cases before the courts of last resort are cited and analyzed somewhat in Long on Irrigation (second edition) and Wiel on Water Rights (third edition), and no useful purpose would be

served by further reference here. It is to be observed that in applying the doctrine of riparian rights the supreme court of California proceeded upon the theory that the United States, as the original owner of the public lands and the streams bordering upon or flowing through them, had the common-law rights of a riparian proprietor; that, whenever a grant of public riparian lands was made without reservation, the patentee succeeded to the same riparian rights which the United States had enjoyed; and that any right acquired by appropriation of water on public land was founded in grant from the United States in virtue of the congressional enactments of 1866, 1870, and later statutes. On the other hand, the courts affirming the Colorado doctrine have proceeded upon the theory that the use of water in natural streams, whether upon public or private lands, is subject to state regulation and control; that in respect to public and privately owned lands lying in the same state the United States, as land owner, has no greater rights than the individual land owner; that the common-law doctrine of riparian rights is unsuited to the conditions prevailing in the arid or semi-arid states of the Rocky Mountain region, and for that reason, never prevailed, or, if ever recognized, was thereafter repudiated, and therefore neither the United States nor the patentee has such rights, and that it is competent for any state so situated to adopt the doctrine of appropriation as the only means through which the beneficial use of water flowing in the natural streams may be enjoined, and that the appropriator derives his right from the state in the exercise of local sovereignty.

Under the California doctrine the rights of parties who claim under grants from the federal government must be determined by reference to laws enacted by the Congress pursuant to the provisions of section 3, Article IV, of the Constitution of the United States, and a patentee under a grant without reservations acquired vested rights which a state cannot impair. Under either doctrine the *corpus* of running

water in a natural stream is not the subject of private ownership, though this elementary principle is apparently overlooked in some of the decided cases. Such water is classed with light and the air in the atmosphere. It is *publici juris* or belongs to the public. A usufructuary right or right to use it exists, and the *corpus* of any portion taken from the stream and reduced to possession is private property so long only as the possession continues.

These principles were borrowed by the common law from the civil law and in turn were borrowed by the law of appropriation from the common law. To recapitulate: The common-law doctrine excludes the nonriparian land owner from the use of water and confines the riparian owner in its use to riparian lands. It classifies the uses to which water may be applied and gives preference to the so-called natural uses.

Contiguity to the stream is the foundation of the doctrine of riparian rights, but it is disregarded by the doctrine of appropriation. Since the common-law rights attach to the riparian land as a part of it, no formalities are needed to exercise those rights; on the other hand, certain proceedings are necessary to acquire rights by appropriation. Use is the foundation of the law of appropriation, and the rights acquired thereunder may be lost by nonuse, whereas nonuse does not affect riparian rights. Equality of rights and reasonable use distinguish the common-law doctrine, while the appropriation rule sanctions exclusive use measured by priority, and, by fixing the amount of every appropriation, aims at certainty and the avoidance of needless litigation. Each of these doctrines has been modified greatly by recent legislation and judicial decisions.

Many cases involving the law of irrigation and water rights in western jurisdictions have been reviewed by the supreme court of the United States. The conclusions announced are not always readily reconcilable one with another, but indicate rather a gradual development of the law. In *Starr* v. *Beck,*

133 U. S. 541, 551, 33 L. Ed. 761, 10 Sup. Ct. Rep. 350 [see, also, Rose's U. S. Notes], the court declared that the rights of a riparian owner attach when the government transfers title, and that they cannot be subsequently invaded.

In *United States* v. *Rio Grande Irr. Co.*, 174 U. S. 690, 43 L. Ed. 1136, 19 Sup. Ct. Rep. 770 [see, also, Rose's U. S. Notes], it was held competent for a state to change the common-law rule with reference to the use of waters, provided such change does not operate to impair or defeat the riparian rights of the government to the flow and use of waters in natural streams upon the public domain, or countenance interference with commerce on navigable waters.

Finally, in *Winters* v. *United States*, 207 U. S. 564, 577, 52 L. Ed. 340, 28 Sup. Ct. Rep. 207, 212 [see, also, Rose's U. S. Notes], the court declared that the "power of the government to reserve the waters [in streams on a government reservation] and exempt them from appropriation under the state laws is not denied, and could not be."

Standing alone, these pronouncements would seem to confirm the California theory of federal proprietary title with the common-law riparian rights attached thereto and passing from the United States to the patentee, free from state interference or control. But it is to be observed that *Sturr* v. *Beck* arose in Dakota territory, where the common-law doctrine of riparian rights prevailed, and the decision is to be understood with reference to that fact. In *United States* v. *Rio Grande Irr. Co.* the court reviewed the Acts of Congress of July 26, 1866 (3 Fed. Stats. Ann., 2d ed., p. 1002 (U. S. Comp. Stats., sec. 4674), of March 3, 1877 (8 Fed. Stats. Ann., 2d ed., p. 892 (U. S. Comp. Stats., sec. 4674), and of March 3, 1891 (8 Fed. Stats. Ann., 2d ed., p. 803 (U. S. Comp. Stats., sec. 4934), and concerning them said: "Obviously by these Acts, so far as they extended, Congress recognized and assented to the appropriation of water in contravention of the common-law rule as to continuous flow. * * * And in reference to all these cases of purely local interest the obvious

purpose of Congress was to give its assent, so far as the public lands were concerned, to any system, although in contravention to the common-law rule, which permitted the appropriation of those waters for legitimate industries.'' *Winters* v. *United States* involved the right to the use of the waters of Milk River in this state, and the decision turned upon a construction of the treaty made by the United States with the Indians, under which a large portion of the Fort Belknap reservation was opened to settlement.

In *Hardin* v. *Jordan*, 140 U. S. 384, 35 L. Ed. 428, 11 Sup. Ct. Rep. 808, 838, the court declared that a grant from the government, without reservation, is to be construed according to the laws of the state in which the lands lie.

In *Clarke* v. *Nash*, 198 U. S. 361, 370, 4 Ann. Cas. 1171, 49 L. Ed. 1085, 25 Sup. Ct. Rep. 676, 679 [see, also, Rose's U. S. Notes], the court said: ''The rights of a riparian owner in and to the use of water flowing by his land are not the same in the arid and mountainous states of the west that they are in the states of the east. These rights have been altered by many of the western states, by their Constitutions and laws, because of the totally different circumstances in which their inhabitants are placed from those that exist in the states of the east, and such alterations have been made for the very purpose of thereby contributing to the growth and prosperity of those states arising from mining and the cultivation of an otherwise valueless soil, by means of irrigation. This court must recognize the difference of climate and soil, which render necessary these different laws in the states so situated.''

In *Kansas* v. *Colorado*, 206 U. S. 46, 51 L. Ed. 956, 27 Sup. Ct. Rep. 655 [see, also, Rose's U. S. Notes], the court apparently departed from the theory that the rights of an appropriator of water from a stream upon the public domain rests in grant from the government evidenced by the several federal statutes, and treated the question from the standpoint of power inherent in local sovereignty, regardless of the so-called proprietary rights of the United States, and de-

clared that every state in the Union "may determine for it-
self whether the common-law rule in respect to riparian
rights or that doctrine which obtains in the arid regions of the
west of the appropriation of waters for the purposes of ir-
rigation shall control."

In *Producers' Oil Co.* v. *Hanzen,* 238 U. S. 325, 338, 59
L. Ed. 1330, 35 Sup. Ct. Rep. 755, 759, the same principle
was reiterated. The court said: "The effect of riparian rights,
if established, would depend upon the local law," and in *Nor-
ton* v. *Whiteside,* 239 U. S. 144, 153, 60 L. Ed. 186, 36 Sup.
Ct. Rep. 97, 100, in reference to the claim of riparian rights
on navigable waters, the court said: "It was long since af-
firmatively settled that such claim solely involves a question
of state law."

If, then, it may be accepted as finally settled that a pat-
entee from the government has such rights only, in virtue of
his conveyance, as are recognized by the law of the state
where the lands are situated, it follows that the solution of
the question now before us depends upon the answer to the
inquiry: What is the rule in this state respecting the use of
water for irrigation and other beneficial purposes?

It is interesting to note that since the organization of Mon-
tana territory—a period of more than fifty years—no owner,
claimant, or occupant of riparian lands has ever asserted
in the courts the common-law doctrine of riparian rights, as
applied to the use of water, until the present action was in-
[13] stituted, so far as our investigation discloses. It is true
that there are numerous reported cases, beginning with *Co-
lumbia Min. Co.* v. *Holter,* 1 Mont. 296, in which observations
are made upon some phase or other of the riparian rights doc-
trine, but even a cursory examination of the facts will dis-
close that the question of riparian rights was not involved
in any of them, and that the comment made upon the subject
in every instance is purely *obiter dictum.* For any or all of
those expressions it is not necessary to offer explanation or
excuse. The language of Honorable Simeon E. Baldwin is

particularly pertinent here: "If the writer of a judicial
opinion has permitted his pen to move too fast and gone be-
yond the exigencies of the case, it is the strength of our
system of remedial justice that his words lose their authority,
as soon as the bounds of necessity are passed." (18 Yale Law
Journal, 1, 8.)

Long on Irrigation classes Montana with the states which
adhere to the California doctrine, and *Prentice* v. *McKay*, 38
Mont. 114, 98 Pac. 1081, is cited to justify the classification.
After referring to the elementary principle that the owner of
nonriparian land cannot initiate a right to appropriate water
from a stream flowing through privately owned land by tres-
passing upon such land, we said that our statutes only apply
to appropriations made from streams on public land and to
such other appropriations "as are made by individuals who
have riparian rights either as owners of riparian lands or
through grants from such owners." The use of the terms
"riparian rights" evidently has been misleading, but they
were employed only to indicate rights of access to the stream,
and not the rights of continuous flow and use of the waters
as recognized by the common law.

We feel entirely at liberty to treat the matter as one of
first impression in this jurisdiction and to seek the public
policy of the state and of the territorial government which
preceded it by reference to the legislation which has been
enacted upon the subject.

The First Territorial Legislative Assembly passed an Act
(approved January 12, 1865) "to protect and regulate the
irrigation of land in Montana territory." That Act pro-
vided that any owner or holder of a possessory right or title
to land on the bank or margin or in the neighborhood of any
stream should be entitled to the use of the water of such
stream for the purpose of irrigation, and, if his land was too
far removed from the stream to obtain access otherwise, he
should have a right of way for the necessary ditch or ditches
over the intervening property. (Bannack Statutes, p. 367.)

Certain sections of that Act were declared to be invalid (*Thorp* v. *Woolman,* 1 Mont. 168), and the remaining portions were replaced by an Act of the Sixth Legislative Assembly (1870), which in effect re-enacted the first provisions above. (Laws 1869–70, p. 57.) That Act was carried forward into the Codified Statutes of 1872 as Chapter 34, with the addition of section 11, which provides: ''That in all controversies respecting the right to water in this territory, whether for mining, manufacturing, agriculture, or other useful purpose, the rights of the parties shall be determined by the dates of appropriation respectively, with the modifications heretofore existing under the local laws, rules, or customs and decisions of the supreme court of the territory.''

In 1877 an Act was passed by the Tenth Legislative Assembly which regulated the sale of surplus water. (Laws 1877, p. 406.) In 1879 the first section of Chapter 34, Laws of 1872, was amended, and by the amendment the right of one to appropriate all the water of a stream was recognized, provided that quantity was necessary for his use, and provided further that, if at any time a surplus over and above his needs existed, such surplus should be turned back into the stream for the use of those having junior rights. (Laws 1879, p. 52.) The Act passed in 1885 (Laws 1885, p. 130) provided only for a method of procedure to be observed in making an appropriation of water, and section 5 of that Act declared: ''As between appropriators, the one first in time is first in right.'' The Compiled Statutes of 1887 merely carried forward Chapter 34, Laws of 1872, as amended by the Act of 1879, and the Acts of 1877 and 1885 above. (Comp. Stats., p. 992.) This completes the history of our water right legislation up to the time Montana was admitted into the Union.

Section 15, Article III, of our state Constitution provides: ''The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution or other beneficial use and the right of way over the lands of others,

for all ditches, drains, flumes, canals and aqueducts, necessarily used in connection therewith, as well as the sites for reservoirs necessary for collecting and storing the same, shall be held to be a public use." In 1891 a special eminent domain statute was enacted which provided a ready means for securing a right of way for ditches, flumes, or canals for irrigation and other purposes. (Laws 1891, p. 295.) The provisions regulating the appropriation and use of water which came into existence with the adoption of the Codes of 1895 (secs. 1880–1902, Civ. Code) are somewhat more comprehensive than the laws upon the same subjects theretofore in force, but they do not depart therefrom in any essential particular so far as the question now involved is concerned; on the contrary, section 1884 continued the recognition of the right of one to appropriate all the waters of a stream under like restrictions as imposed by the amendment made in 1879, referred to above. In 1899 two Acts were passed. One changed the standard of measurement of water (Laws 1899, p. 126), and the other provided for the appointment of commissioners to measure and distribute waters the right to which had been, or which should thereafter be, adjudicated. (Laws 1899, p. 136). In 1905 a statute was enacted (Laws 1905, Chap. 44) which provides: "That the government of the United States may by and through the secretary of the interior, or any person by him duly authorized to act in that behalf, appropriate the water of streams or lakes within the state of Montana in the same manner and subject to the general conditions applicable to the appropriation of the waters of the state by private individuals." With slight additions and amendments, not material here, the law has continued to the present time.

These several provisions must be accepted as indicating the public policy of Montana respecting the subject now under review. They recognize: (1) The right to the use of water on nonriparian lands, even though such lands lie beyond the watershed of the stream from which the water is taken; (2)

the right of one to take and use all of the waters of a stream, if appropriated by him and necessary to his use and actually used by him for a lawful purpose; (3) that the one first in time is first in right without reference to the so-called natural and artificial uses; (4) that an appropriator derives his right from the state, and not from the national government, and that the use of waters flowing in natural streams in this state is subject to state regulation and control; (5) that an appropriation is not confined to waters flowing in streams upon public land, but may be made from a stream flowing through privately owned land by invoking the aid of eminent domain proceedings, if necessary, as authorized by the language of the Constitution quoted above (*Prentice* v. *McKay,* above); and (6) that, in order for the government of the United States to acquire the right to the use of waters flowing in the natural streams in this state, it must proceed as an individual to make an appropriation in compliance with the laws of this state.

In speaking of the territorial Act of 1865 above, Judge Knowles said: "As far as the legislative assembly of Montana had the power, they repealed the common-law doctrine in regard to riparian proprietors." (*Thorp* v. *Freed,* 1 Mont. 651, 657.) In *Smith* v. *Denniff,* 24 Mont. 20, 23, 81 Am. St. Rep. 408, 50 L. R. A. 741, 60 Pac. 398, 399, Mr. Justice Pigott, speaking for the court, said: "The doctrine of 'prior appropriation' confers upon a riparian owner, or one having title to a water right by grant from him, the right to a use of the water of a stream which would be unreasonable at the common law, and to this extent the doctrine of prior appropriation may be said to have abrogated the common-law rule." It may be conceded that in each instance the observations were not necessary to the decision rendered, but they do, respectively, represent the views of the distinguished jurists who in the early days were largely instrumental in formulating the public policy of Montana respecting this subject. See, also, the article of Judge Hunt, erstwhile

Associate Justice of this court, United States District Judge for the District of Montana, and now United States Circuit Judge for the Ninth Circuit, in 17 Yale Law Journal, 585.

It is submitted that the policy established by the measures above is irreconcilable with the application of the doctrine of riparian rights even in the modified form in which that doctrine now prevails in the states adhering to the California rule; that our Constitution and statutes proceed upon the theory that artificial irrigation is absolutely necessary to the successful cultivation of large areas of land within the state; that the doctrine of appropriation was born of the necessities of this state and its people; and that it was intended to be permanent in its character, exclusive in its operation, and to fix the status of water rights in this commonwealth.

"The common law, as it existed in England at the time of the settlement of the American Colonies, has never been in force in all of its provisions in any colony or state of the United States. It has been adopted so far only as its general principles were suited to the habits and condition of the colonies, and in harmony with the genius, spirit, and objects of American institutions. Different political and geographical conditions may justify modifications, and whether common-law rules will be followed strictly in the United States will, necessarily, where no vested rights are actually concerned, depend on the extent to which they are reasonable and in accord with public policy and sentiment. And from this circumstance it is clear that what may be the common law in one state is not necessarily so considered in another." (Ann. Cas. 1913E, p. 1232, note.) As emphasizing the correctness of this rule, the supreme court of the United States, in *Boquillas Cattle Co.* v. *Curtis*, 213 U. S. 345, 53 L. Ed. 822, 29 Sup. Ct. Rep. 495 [see, also, Rose's U. S. Notes], said: "Patentees of a ranch on the San Pedro have not the same rights as owners of estates on the Thames."

Our conclusion is that the common-law doctrine of riparian rights has never prevailed in Montana since the enactment of

the Bannack Statutes in 1865; that it is unsuited to the conditions here; and that the complaint in this action does not state facts sufficient to entitle the plaintiff to relief.

The judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REYNOLDS and COOPER concur.

MR. CHIEF JUSTICE GALEN, being disqualified, takes no part in the foregoing decision.

