FILED

07/26/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0786

DA 15-0786

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 179

_____

STEVEN KELLY, MONTE GIESE, HENRY
NAGAMORI and KALANICK RANCH, INC.,

        Plaintiffs and Appellees,

    v.

TETON PRAIRIE LLC,

        Defendant and Appellant.

_____

APPEAL FROM:    District Court of the Ninth Judicial District,
                     In and For the County of Teton, Cause No. DV-14-022
                     Honorable Katherine M. Bidegaray, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                David T. Markette, Dustin M. Chouinard, Markette & Chouinard PC,
                Hamilton, Montana

        For Appellees:

                Stephen R. Brown, Garlington, Lohn & Robinson, PLLP,
                Missoula, Montana

                              Submitted on Briefs:  May 25, 2016

                                      Decided:  July 26, 2016

Filed:

                                _____
                                           Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1    Teton Prairie LLC, appeals the amended order of the Ninth Judicial District Court, Teton County, granting Steven Kelly's, Monte Giese's, Henry Nagamori's, and Kalanick Ranch, Inc.'s, (Appellees) motion for summary judgment and denying Teton Prairie's counter-motion for summary judgment.  We affirm.

**ISSUES**

¶2    We restate and review the following issues:

*1. Whether the District Court correctly applied the Prior Appropriation Doctrine pursuant to § 85-2-401(1), MCA.*

*2. Whether the District Court correctly found that Teton Prairie failed to establish the necessary elements to raise the defense of Futile Call Doctrine.*

*3. Whether the District Court's injunction was proper.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3    The present dispute involves multiple water right holders on the mainstream of the Teton River, in Teton and Chouteau Counties, Montana.  The headwaters of the Teton River are located in west-central Montana, northwest of the town of Choteau, along the Rocky Mountain Front.  After leaving the mountains, the river flows east, making southeast and northeast turns through Teton and Chouteau Counties, to its confluence with the Marias River.  The river has two main tributaries:  Muddy Creek in the north, located near Collins; and Deep Creek in the south, located near the town of Choteau.  The United States Geological Survey (USGS) maintains river gauges near the towns of Dutton and Loma.

2

¶4 The river's source of early season high flows is spring runoff, and the late season low flows are sustained by melting snowpack. It is common for stretches of the river to be completely dry by late summer. The Teton River does not have an onstream reservoir to stabilize late season flows. The river is located in the Teton River Basin, 41O, which has not yet been finally adjudicated and is currently controlled by a Temporary Preliminary Decree. The individual water rights held by the parties to this case have undergone the adjudication process and the extent of each right has been determined, but due to other water users' outstanding cases in the Basin they await the entry of a final decree.

¶5 The Teton River has long been used to support farming and ranching. It has also long been the subject of water disputes amongst water users. The upper portion of the Teton River has been administered by a water commissioner under district court decree since 1908.[1] The lower portion, where the parties' rights are located, is not included in this decree. Each of the Appellees own property in Chouteau County and conduct farming and ranching operations. Teton Prairie owns property in Teton County, upstream from Appellees' properties. Appellees hold water rights mainly for stockwater purposes, but also for domestic use.[2] Teton Prairie's water rights are for irrigation, and Teton Prairie's rights are junior to all of Appellees' rights.

---

[1] *Perry v. Beattie*, Cause No. 371, Montana Eleventh Judicial District Court, Teton County, March 28, 1908. (Teton County is now part of the Ninth Judicial District).

[2] Appellees' rights are not limited by decreed flowrates.

3

¶6     In July 2013, Appellees ascertained, through their own observations and through data available from the USGS-maintained river gauges, that flows had diminished such that they were not receiving the full extent of their water rights. On July 15, 2013, the USGS stream gauge near Loma, which is located downriver from all parties, reported 3.0 cubic-feet-per-second (cfs) of mean stream flow.[3] For the following days the flowrate continued to drop rapidly. On July 18, 2013, the Loma gauge recorded 0.92 mean cfs, which prompted Appellees to instruct their attorney to send call letters to junior upstream users on the middle Teton River. On July 19, 2013, the Loma gauge recorded 0.55 mean cfs, and Appellees' attorney sent call letters to junior water rights holders on Deep Creek and Muddy Creek. By July 23, 2013, the Loma gauge recorded 0.00 cfs, where the flowrate remained through August 6, 2013. However, on August 5, 2013, the flows at Appellees' points of diversion returned to a level that rendered the call for water in its original state unnecessary. At the time of the July calls for water Teton Prairie was not diverting water because it was shut down to hay.

¶7     Later, in the month of August 2013, flows decreased again to the point to warrant Appellees to make another call for water. On August 15, 2013, the Loma gauge recorded 3.7 mean cfs. By August 19, 2013, the Loma gauge recorded 1.9 mean cfs. On August 22, 2013, the Loma gauge recorded 0.28 mean cfs, and Appellees' attorney sent another round of call letters to junior users who had been observed diverting water, including Teton Prairie. Despite the call, Teton Prairie continued to divert water, and in response

---

[3] The public data available from the USGS stream flow gauges report one, single cfs measurement per day. It is reported as the mean daily flowrate, though the flow may increase or decrease throughout the day.

Appellees filed suit in District Court. They claimed wrongful interference of a water right, wrongful diversion of water by a junior water right holder, and requested injunctive relief.

¶8 The parties filed counter-motions for summary judgment. In its motion, Teton Prairie requested the court determine Appellees' August call for water was futile, and further Appellees' call for water was not procedurally proper. On June 22, 2015, the District Court issued an amended order granting Appellees' motion for summary judgment and denying Teton Prairie's counter-motion for summary judgment.[4] The court found Teton Prairie violated the Prior Appropriation Doctrine by ignoring Appellees' August 22, 2013, call for water. The court further found Appellees' call for water was not futile because evidence showed water would have reached Appellees' points of diversion if Teton Prairie had stopped diverting, and significant material facts exist to preclude determining Appellees failed to make a "valid" call for water. The court enjoined Teton Prairie from "continuing out-of-order diversions of water after receiving call letters from senior appropriators on the Teton River, including those from [Appellees]."

## STANDARD OF REVIEW

¶9 We review a district court's entry of summary judgment de novo and apply the same criteria found in M. R. Civ. P. 56. *Mont. Trout Unlimited v. Mont. Dep't of Natural*

---

[4] The District Court's original order, dated June 19, 2015, denied summary judgment on Appellees' claim for damages. Subsequently, Appellees removed their request for damages and the court amended its order to fully grant summary judgment in favor of Appellees.

5

*Res. & Conservation*, 2006 MT 72, ¶ 17, 331 Mont. 483, 133 P.3d 224. We determine whether the court correctly applied the law. *Mont. Trout Unlimited*, ¶ 17.

## DISCUSSION

¶10 *1. Whether the District Court correctly applied the Prior Appropriation Doctrine pursuant to § 85-2-401(1), MCA.*

¶11 Historically, a water right could be acquired by taking possession of water on the public domain and putting it to beneficial use. *Mettler v. Ames Realty Co.*, 61 Mont. 152, 159-60, 201 P. 702, 703-04 (1921). This customary possessory taking of water developed into a rule referred to as the Prior Appropriation Doctrine, which is longstanding in Montana water law. *Mettler*, 61 Mont. 152, 201 P. 702; *Toohey v. Campbell*, 24 Mont. 13, 17-18, 60 P. 396, 397 (1900). The Montana Water Use Act explicitly recognizes the Prior Appropriation Doctrine, and states "[a]s between appropriators, the first in time is the first in right." Section 85-2-401(1), MCA. The fundamental underlying precept of the doctrine is timing—wherein he who first acquires a right to water is entitled to his full appropriation (limited by needs and facilities) before subsequent right holders may maximize their rights. *Meine v. Ferris*, 126 Mont. 210, 216, 247 P.2d 195, 198 (1952) (quoting *Mettler*, 61 Mont. at 159-60, 201 P. at 703); *Smith v. Duff*, 39 Mont. 382, 387-88, 102 P. 984, 985 (1909). If a senior appropriator found he was not receiving his full appropriation under the doctrine he was allowed some measure of self-help in the form of making a call upon a junior appropriator to cease diversions until the senior's appropriation was maximized. A. Dan Tarlock, *Law of Water Rights and Resources*, § 5:33 (2015 ed.). Unless futile, a junior appropriator, who

is said to have taken notice of prior conditions upon his subsequent appropriation, must heed the senior's call. Tarlock, § 5:33; *Quigley v. McIntosh*, 110 Mont. 495, 505, 103 P.2d 1067, 1072 (1940).

¶12 Teton Prairie argues Appellees' August call for water was invalid because Appellees only made calls to "selective" junior appropriators who were observed actively diverting water. Further, Teton Prairie contends Appellees should have ordered the call in priority of the most recent priority date first, and so forth. It is undisputed that all of Teton Prairie's water rights are junior to all of Appellees' rights.

¶13 The District Court properly noted there is no statutory or judicial procedure that required Appellees to follow a specific method of making a call. Under the law Appellees are allowed—as is Teton Prairie—to maximize their appropriations by requesting injurious junior appropriators cease harming their senior water rights. If a senior's water right is injured by a junior's use, any and all juniors injuring the senior are equally answerable for the injury. *Helena v. Rogan*, 26 Mont. 452, 470, 68 P. 798, 800 (1902).

¶14 In essence, Teton Prairie suggests Appellees should have made a call to the most recent priority date, waited to determine if Appellees' rights were fully restored, and if not then continued making calls in reverse priority. To require a senior appropriator to make calls upon juniors in such a strict order of reverse priority is contrary to the purpose of the doctrine. From the perspective of the senior all actively injurious juniors are one-and-the-same. Here, the record clearly shows Appellees were actively observing flows at their points of diversion, monitoring available streamflow data throughout the

7

months of July and August, and communicating with various upstream junior users about their water use. In this instance, Appellees followed a reasonable method of making calls for water when they determined their rights were impaired.

¶15 Additionally, although Teton Prairie suggests Appellees should have waited until the river was completely dry to make their calls, it is not disputed that the river's flowrate was rapidly decreasing, and within days of Appellees' August call for water the river was completely dry. Whether or not Appellees waited for two days until there was no recordable water flow at the downriver USGS gauge station to notify junior appropriators of their call does not repudiate that senior Appellees were not receiving the full extent of their rights, and junior Teton Prairie ignored a call for water. The crux of this case involves the application of the Prior Appropriation Doctrine, and is not determined by the precise moment in time at which Appellees' rights were harmed.

¶16 We further note that while the USGS stream gauge data are helpful metrics to understand and quantify streamflow, they do not definitively show whether Appellees were or were not receiving the full extent of their rights on a given date due to the dynamics of the river and the types of Appellees' water rights. Even in the event a call is honored an instantaneous increase in flowrate is unlikely to occur. Here, the record indicates it would take several days for water to reach Appellees' points of diversion after upstream users ceased diverting. Under these facts, with these types of water rights involved, we will not require such a burdensome administration of the Prior Appropriation Doctrine. *Raymond v. Wimsette*, 12 Mont. 551, 560, 31 P. 537, 540 (1892) (stating a senior appropriator "is entitled to insist that . . . water remain, in order to carry

the flow down to his point of diversion, although a large portion of it would be lost by evaporation and percolation.").

¶17    We hold that the District Court correctly applied the Prior Appropriation Doctrine when it found junior Teton Prairie improperly ignored a call for water by senior appropriators.   Therefore, based on the undisputed facts Appellees were entitled to judgment as a matter of law that Teton Prairie violated the Prior Appropriation Doctrine when it continued to divert water from the Teton River after receiving Appellees' call for water.

¶18    *2. Whether the District Court correctly found that Teton Prairie failed to establish the necessary elements to raise the defense of Futile Call Doctrine.*

¶19    The Futile Call Doctrine is an affirmative defense that a junior water right holder may invoke when the junior elects not to honor a call for water made by a senior appropriator.  Tarlock, § 5:33; *Fort v. Dep't of Ecology*, 135 P.3d 515, 518 (Wash. 2006). Under the doctrine, a call for water is deemed futile if the amount of water necessary to meet an appropriation will not reach a senior appropriator's point of diversion because of carriage losses.  Tarlock, § 5:33.  The underlying idea behind the Futile Call Doctrine is that the primary purpose of water appropriation is to put water to beneficial use.  *Power v. Switzer*, 21 Mont. 523, 529, 55 P. 32, 35 (1898).  If a junior is required to respond to a call for water and the outcome will result in no beneficial use by the senior but only in the waste of water, then the junior is excused from responding to the call, and the waste, which is factually and legally undesirable, will be avoided.  *Fort*, 135 P.3d at 518; *State ex rel. Crowley v. Dist. Court*, 108 Mont. 89, 103, 88 P.2d 23, 29-30 (1939).

9

¶20 While the defense of futile call has not explicitly been adopted in Montana, we have long recognized that the burden is placed on the junior user to show his actions are not injurious to the senior. *Donich v. Johnson*, 77 Mont. 229, 241, 250 P. 963, 966 (1926). Therefore, in this case, Teton Prairie, in seeking to excuse its disregard of Appellees' call, was required to show no useable water would reach Appellees' points of diversion. *Irion v. Hyde*, 110 Mont. 570, 581-82, 105 P.2d 666, 673 (1940); *Raymond*, 12 Mont. at 560, 31 P. at 540. Here, testimony revealed Appellees were not receiving the full extent of their water rights. Expert testimony revealed usable water could have traveled to the Appellees' points of diversion between five to ten days after Teton Prairie ceased diverting. Therefore, the District Court correctly found that Teton Prairie failed to establish the necessary elements to successfully invoke the defense of futile call to defend its failure to respond to Appellees' call for water.

¶21 *3. Whether the District Court's injunction was proper.*

¶22 By statute a district court's jurisdiction includes the supervision of water distribution amongst appropriators. Section 85-2-406(1), MCA. Furthermore, a court has the authority to grant an injunction when it appears the applicant is entitled to the relief sought, and the relief entails the restraint of the continuance of the complained of act, or when the continuance of the act would produce great or irreparable injury. Section 27-19-201, MCA. The availability of injunctive relief is vested in "the sound discretion of the district court, . . . the exercise of which this [C]ourt will not interfere except in instances of manifest abuse." *Parsons v. Mussigbrod*, 59 Mont. 336, 340-41, 196 P. 528, 529 (1921) (citations omitted).

10

¶23 The District Court granted injunctive relief that "enjoin[s] [Teton Prairie] from continuing out-of-order water diversions after receiving calls for water from senior appropriators on the Teton River." Teton Prairie argues that the District Court set the scope of the injunction too broadly to include parties outside of the current action. Further, it argues that the injunction lacks sufficient detail and parameters for Teton Prairie to intelligibly follow.

¶24 We find that the District Court was well within its authority and sound discretion to grant an injunction in this matter, and we find no instance of manifest abuse. Furthermore, we find that Teton Prairie's arguments lack merit. The District Court has ordered Teton Prairie to refrain from no more activity than that which is required of it under the Prior Appropriation Doctrine and Montana law. Therefore, we affirm the District Court's grant of injunctive relief to Appellees.

## CONCLUSION

¶25 For the foregoing reasons, the District Court's amended order granting Appellees' motion for summary judgment and denying Teton Prairie's counter-motion for summary judgment is affirmed.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA

Justice Jim Rice, concurring.

¶26 I concur with the results reached by the Court and write separately to offer additional observations. This important case addresses water law issues for which we have no prior precedent.

¶27 Under Issue 1, Teton Prairie argues that Appellees were required to make their August 22, 2013 call "in reverse priority to every water right holder," rather than limiting the call to particular junior appropriators it had observed using water. Teton Prairie labels Appellees' action a "selective call" that shifts the enforcement burden from senior appropriators to junior appropriators to enforce their relative seniority over other junior appropriators, and that altogether relieves those junior appropriators who were not observed using water from curtailing their use. Teton Prairie calls this a "trickle down enforcement effect" that conflicts with orderly administration of the Prior Appropriation Doctrine and that fails to consider the relative priority of junior claims. It quotes a brief statement in an August 30, 2011, memorandum from the Montana Water Policy Interim Committee that "[t]he senior will call each user in the order of the most junior to the most senior until the right is satisfied."

¶28 As logically appealing as this argument initially sounds, I find it significant that Teton Prairie cited to no case precedent supporting the proposition that calls must be made rigidly in the order of priority, from most junior to most senior, and my search likewise revealed no such authority. As the District Court reasoned:

> There is no authority for Teton Prairie's contention that a junior water rights holder may simply not comply with a senior water rights holder's call for water because every other junior rights holder has not been called. It is possible

12

that best practices would lead to the senior water rights holder calling all junior water rights holders, including groundwater rights holders, but to impose the absolute obligation that these calls must be made before any call is "valid," is against the spirit of the prior appropriation doctrine. Any mistake being made by a senior rights holder making a call for water being reason enough for a junior rights holder to ignore the call would unnecessarily restrict the rights of senior water rights holders.

Presumably under Teton Prairie's interpretation, any junior water rights holder could continue diverting water until they are satisfied that all other junior rights holders have been called, which could mean days or weeks of senior rights holders not having their rights met. In the instant case, the Plaintiffs made calls for water on every junior water rights holder that they observed using water from the Teton River and only Teton Prairie did not comply.

Given the lack of contrary authority, I believe the practicalities cited here by the District Court demonstrate that the Prior Appropriation Doctrine is best applied by requiring Appellees' call to Teton Prairie to be honored. Perhaps the future development of technology will make it possible for calls to be efficiently and immediately communicated to junior appropriators in the exact order of priority, or a Water Commissioner will be appointed to provide on-the-ground management of the issue, but, based on the manner in which the system currently operates, I agree with the Court that the District Court correctly decided the issue.

¶29   The other argument made by Teton Prairie under Issue 1 is that the Appellees made an improper "pre-emptive call" because, at the time of their August 22, 2013 call, it is undisputed that Appellees "had water flowing past their respective diversion points in excess of the amounts adjudicated at the time the call was made." Citing the principle that "a prior right may be exercised only to the extent of the necessities of the owner of such prior right and when devoted to a beneficial purpose within the limits of the right[,]" *Cook v. Hudson*, 110 Mont. 263, 282-83, 103 P.2d 137, 146 (1940), Teton Prairie

13

contends that Appellees were limited to the water necessary for their beneficial use, and that the District Court, by approving a call made before Appellees' water fell below their allotted rights, permitted Appellees to "exceed their adjudicated water rights." Teton Prairie contends that Appellees can now make calls "with no parameters or limits" and that they have the right to subjectively "call whenever they believe water may become deficient at some point in the future," even an "unquantified" and unlimited amount of water.

¶30 Teton Prairie supports its assertion that Appellees had enough water at the time of their call by use of a formula for calculating the flowrate necessary to satisfy an animal unit, referencing a DNRC guideline, up to the maximum number of livestock to be serviced, as adjudicated by the Water Court for Appellees' stockwater rights. Appellees respond that their stockwater rights were not adjudicated with flowrates by the Water Court, and that Teton Prairie's use of this formula constitutes a collateral attack on their water rights. Teton Prairie replies that such calculations have been previously used to quantify the flowrate of stockwater rights, citing a Water Master's Report.

¶31 As Teton Prairie notes, the Water Court has stated that a flowrate measurement for a stockwater right "may be difficult to make." *In re Jefferson River Basin*, Mont. Water Co., 1993 Mont. Water LEXIS 7 (Sept. 21, 1993). While I do not categorically reject efforts to quantify a stockwater right flowrate, as such calculations could be useful in the right context, I find it unnecessary to resort to such a calculation to resolve the issue presented here.

14

¶32 In its ruling, the District Court accepted that Teton Prairie was factually correct about the status of water available to Appellees when they issued the August 22, 2013 call. However, it determined that Teton Prairie's objection to the call was practically "untenable" because the Teton River was rapidly dropping near the Appellees' properties at the Loma gauge, and expert testimony had agreed it would take days, perhaps 5 to 10, for water at Teton Prairie's diversion to reach Appellees' property. The court concluded that Appellees' need for more water was "clearly obvious" and that they were not obligated "to wait until the river goes dry," and their rights to become unsatisfied, before making a call. Similarly, Appellees argue on appeal that, based on their "significant historical experience" with this river system and the "dynamic nature of river systems" generally, "it was reasonable for Appellees to make calls for water when trends in the flows indicated that the river soon would be dry[.]"

¶33 The parties' properties on this system are some 200 river miles apart. Even the expert witnesses could not state with exactness the timing and the impact of Teton Prairie's cessation of water use upon Appellees' properties. The current nature of this science is inexact. However, Appellees' call was made with reasonable knowledge that the loss of sufficient water to sustain their rights was imminent, or in the words of the District Court, was "clearly obvious." At such a point, I believe senior appropriative rights may be enforced by making the call. It is important to remember that the burden rests on a senior appropriator to make his needs known, or junior appropriators cannot be faulted when the senior runs dry. *See Cook*, 110 Mont. at 283, 103 P.2d at 146 ("When the one holding the prior right does not need the water, such prior right is temporarily

suspended and the next right or rights in the order of priority may use the water *until such time as the prior appropriator's needs justify his demanding that the junior appropriator or appropriators give way to his superior claim.*") (emphasis added).

¶34 Another reason such a rule is necessary is that requiring the river to run dry at a senior appropriator's place of use would feed a junior appropriator's futile call defense. Once carrier water is depleted and the bed is dry, a larger amount of water is needed to satisfy a downstream right, increasing the chances a junior appropriator could sustain a futile call claim. *See Irion*, 110 Mont. at 581-82, 105 P.2d at 673. Senior appropriators should not be forced to delay a call and thereby increase the risk of that they will lose a futile call claim.

¶35 These reasons also undermine Teton Prairie's argument that material factual conflicts prevented summary judgment on its futile call claim. Assuming Deep Creek was dry in places, there was also evidence that water was flowing in some places through Deep Creek. The strength of the expert testimony, as noted by the Court, that additional water could have flowed to Appellees' properties on the Teton River upon Teton Prairie's cessation, even if the exact timing was in question, demonstrates that Teton Prairie had not satisfied its burden under *Irion*. *Opinion*, ¶ 20.

¶36 I concur.

/S/ JIM RICE

16