**FILED**

11/19/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0712

DA 23-0712

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 272

PARROT DITCH CO.,

      Claimant. Objector,
      and Appellant,

   v.

NORMAN ASHCRAFT JR.; COURTNAY O. DUCHIN;
CHARLES M. MILLER; PATTY A. MILLER,

      Objectors and Appellees,

RAFANELLI PARTNERS LLP,

    Notice of Intent to Appear.

APPEAL FROM:    Montana Water Court, Case No. 41G-0256-R-2019
                 Honorable Stephen R. Brown, Associate Water Judge

COUNSEL OF RECORD:

       For Appellant:

             Abigail R. Brown, Ross P. Keogh, Leah Trahan, Parsons Behle &
             Latimer, Missoula, Montana

       For Appellees:

             William C. Fanning, Fanning Law PLLC, Dillon, Montana

       For Amicus Curiae:

             Dana E. Pepper, Bina R. Peters, River and Range Law, PLLC, Bozeman,
             Montana

             Susan B. Swimley, Attorney at Law, Bozeman, Montana

Submitted on Briefs:  August 21, 2024

Decided:  November 19, 2024

Filed:

_____
Clerk

2

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Parrot Ditch Company (PDC) appeals a Water Court order denying its request for a service area and decreeing four water rights, one of which is not at issue in this appeal.

¶2     We affirm.

¶3     We restate the issues on appeal as follows:

*Issue One: Did the Water Court correctly decree PDC's service area?*

*Issue Two: Did the Water Court correctly decree PDC's Townsend and Methodist rights?*

*Issue Three: Did the Water Court correctly decree PDC's Nolte right?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     This dispute centers around the Parrot Ditch Company and its four water rights in the Jefferson River.  PDC delivers water to its Madison County shareholders through the Parrot Ditch, which runs parallel to the Jefferson River in Basin 41G, generally between Silver Star and Cardwell.

¶5     Construction on Parrot Ditch began in 1895 to supply Parrot Silver and Copper Company's Gaylord Smelter with water.  The smelter was never built, but the ditch was used sporadically until 1916, when PDC was organized and purchased the ditch from Montana Power Company.

¶6     PDC was formally incorporated on July 5, 1916 "[t]o acquire, own, hold, manage, control, operate and maintain that certain canal, reservoir and irrigation system out of the Jefferson River now constructed and in process of construction and owned by the Parrot

Ranch Company," and "[t]o distribute the water diverted through any irrigation system owned or operated by [PDC]" to its shareholders.

¶7     PDC originally issued and maintains a total of 8,000 shares, which comprise three types of stock: A Class, B Class, and C Class. A Class stock is company stock that does not correlate to a specific entitlement to water; its main purpose is to bank shares that are sold and/or deeded back to the company. B and C Class shares correspond to the amount of water shareholders are entitled to divert and differ from one another only in relation to whether they belong to shareholders irrigating above or below the "Doherty Overflow." Class B and C shares each represent one eight-thousandth interest in PDC's water rights and irrigation system. PDC stopped issuing shares in 1981.

¶8     Two of the water rights at issue were litigated in 1926, when PDC members filed a complaint to adjudicate "several rights in the said Parrot Ditch in order to obtain the relief provided for in Section 7152, Revised Codes of Montana, 1921." *Pat Carney v. Parrot Ditch Co.*, Findings of Fact Conclusions of Law Judgment and Decree, No. 2271 (Mont. Fifth Judicial Dist. Feb. 8, 1926). In addition to establishing shareholders' respective interests in PDC, *Carney* referenced priority dates and volumes for two different water rights.[1]

---

[1] "That the said Parrot Ditch Co., a corporation, and its predecessors in interest, did on the 8th day of September, 1894, appropriate Twenty Thousand (20,000) inches of water of the Jefferson River," and "[t]hat the said Parrot Ditch Company did, through its predecessors in interest, appropriate fifteen hundred (1500) statutory inches of the waters of the said Jefferson River on the 24th day of January 1880 . . . ." *Carney* at 2.

4

¶9    On March 26, 1982, PDC filed a single statement of claim for five existing rights pursuant to the 1973 Montana Water Use Act, § 85-2-221, MCA. Four are at issue in this appeal. The statement of claim described the place of use as 6,475 acres.

¶10    On October 17, 1989, the Water Court entered a Temporary Preliminary Decree for Basin 41G, which included abstracts for PDC's four Parrot Ditch claims: 41G 195628-00 (Townsend), 41G 195629-00 (Elliot-Buhl), 41G 195631-00 (Nolte), and 41G 195627-00 (Methodist). The Temporary Preliminary Decree described the place of use for the claims as 6,560 acres.

¶11    On April 19, 1990, PDC objected to the place of use as described in the Temporary Preliminary Decree for the Nolte claim, simply stating "acres irrigated are not accurate—need to be updated." PDC did not object to the flow rate.[2]

¶12    On June 13, 1996, the Water Court issued a master's report in case 41G-167 addressing objections to the Townsend, Elliot-Buhl, and Nolte rights, and recommending modifications to the period of use and point of diversion for the three claims. The Water Court adopted the master's report recommendations on July 11, 1996.

¶13    On January 13, 1997, PDC filed a "request to re-open objection" to the Nolte claim and requested that the Nolte flow rate be amended from 50 cfs to 231.2 cfs.

¶14    On April 1, 1997, the Water Court issued a master's report recommending PDC's maximum irrigable acreage be increased to 6,560 acres, and that the Nolte flow rate be adjusted from 50 cfs to 231.2 cfs.

---

[2] This fact is significant because it provides a basis for AMD's objections to the Nolte claim, as discussed in further detail below.

¶15 On July 29, 1997, the Water Court adopted the water master's recommendation.

¶16 On September 7, 2001,[3] and November 6, 2013, the Water Court adopted additional water master's recommendations to amend PDC's irrigated acreage, ultimately increasing the place of use for PDC's four claims to 6,710.78 acres—where it remains today.

¶17 On February 15, 2018, the Water Court issued the Basin 41G Preliminary Decree (Preliminary Decree). Several elements are the same for each of the four claims, including 6,710.78 maximum irrigable acres, place of use, and period of diversion. The flow rates and priority dates are each unique, and the Nolte flow rate was decreed as 231.2 cfs.

¶18 Abstracts for each of the four claims provide:

> COMBINED FLOW RATE FOR CLAIMS NO. 41G 195627-00, 41G 195628-00, 41G 195629-00 AND 41G 195631-00 IS LIMITED TO THE HISTORIC CAPACITY OF THE DIVERSION STRUCTURE AND THE CONVEYANCE SYSTEM. . . . THE SUM TOTAL VOLUME OF THESE WATER RIGHTS SHALL NOT EXCEED THE AMOUNT PUT TO HISTORICAL AND BENEFICIAL USE.

¶19 PDC objected to the Preliminary Decree and asked the Water Court to decree a "service area" for its place of use and to include incidental use remarks providing that stock use be recognized as incidental to irrigation for each of its rights. PDC also asked for certain corrections that are not at issue here.

¶20 Objectors Norman Ashcraft Jr., Courtnay O. Duchin, Charles M. Miller, and Patty Miller (collectively, AMD), objected to various elements of PDC's water rights, including

---

[3] The Water Court Order misstates this date as September 1, 2001.

6

the flow rate and priority date of each right at issue in this appeal. AMD is a group of water users who have mutual interests in related Jefferson River water rights.[4]

¶21 On February 18, 2022, PDC moved for partial summary judgment on three issues, asserting that PDC is entitled to a service area of 7,072.53 acres rather than the decreed 6710.78-acre maximum irrigable acreage for its water rights; that the stock use information remarks should be added to its claims; and that the Water Court was required to hold an evidentiary hearing prior to reducing the Nolte flow rate.

¶22 On June 21, 2022, the Water Court denied PDC's summary judgment motion on the service area issue but granted it as to the remaining two issues and scheduled an evidentiary hearing.

¶23 The Water Court held the evidentiary hearing December 11–13, 2022, and entered its Findings of Fact, Conclusions of Law and Order (Order) on November 13, 2023.

¶24 In its Order, the Water Court granted PDC a service area, but limited it to 6710.78 acres; added an information remark establishing stock use as incidental to irrigation use; and modified the flow rates and/or priority dates for three of PDC's claims—the Townsend, Methodist, and Nolte rights.

¶25 On appeal, PDC argues that the Water Court erred in its finding that PDC's service area is limited to 6,710.78 acres that were historically irrigated under its rights. Further, PDC contends that AMD's interpretation of the *Carney* decision did not overcome the prima facie status of the Townsend and Methodist rights. Finally, PDC contends that the

---

[4] AMD's rights were adjudicated separately in *In re Ashcraft*, 2022 Mont. Water LEXIS 431 (Mont. Water Ct. 2022). AMD uses the same headgate to receive their water as PDC.

7

Water Court incorrectly interpreted a notice statute when it modified the Nolte flow rate based on PDC's failure to notify affected water users about previous flow rate amendments to the claim.

¶26 AMD asks us to affirm the Water Court on all issues and notes that PDC does not controvert any of the factual findings underlying the Water Court's modification of the Townsend and Nolte rights.

## STANDARD OF REVIEW

¶27 The Water Court's factual findings are reviewed for clear error, and its conclusions of law for correctness. *Skelton Ranch, Inc. v. Pondera Cnty. Canal & Reservoir Co.*, 2014 MT 167, ¶ 26, 375 Mont. 327, 328 P.3d 644. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the Water Court misapprehended the effect of the evidence, or we are left with a definite and firm conviction that a mistake was made. *Skelton Ranch*, ¶ 27. "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion, even if the evidence is weak or conflicting." *Twin Creeks Farm & Ranch, LLC v. Petrolia Irrigation Dist.*, 2022 MT 19, ¶ 21, 407 Mont. 278, 502 P.3d 1080 (quotation omitted).

## DISCUSSION

¶28 Historically, water rights were perfected in Montana by diverting water and applying it to a beneficial use. *Kelly v. Teton Prairie LLC*, 2016 MT 179, ¶ 11, 384 Mont. 174, 376 P.3d 143. While the provision of water to third parties does not involve "actual use" by the supplier in a traditional sense, "[t]he appropriation of water for sale has long been accepted as a beneficial use." *Curry v. Pondera Cnty. Canal & Reservoir Co.*,

8

2016 MT 77, ¶ 25, 383 Mont. 93, 370 P.3d 440 (citing *Bailey v. Tintinger*, 45 Mont. 154, 175, 122 P. 575, 582 (1912)).

¶29 In 1973, delegates to the Montana Constitutional Convention recognized "[a]ll existing rights to the use of any waters for any useful or beneficial purpose." Mont. Const. art. IX, § 3(1). The Legislature was directed to "provide for the administration, control, and regulation of water rights and [to] establish a system of centralized records, in addition to the present system of local records." Mont. Const. art. IX, § 3(4). A statewide adjudication of water rights was thus mandated by the Legislature and implemented by the Water Court and Department of Natural Resources and Conservation (DNRC) to bring pre-1973 "existing rights," new beneficial uses, and any proposed changes of use under one administrative umbrella. Accordingly, the Montana Water Use Act (MWUA), Title 85, chapter 2, MCA, provides elements that the Water Court must decree for every water right in Montana, including the purpose, source, period of use, place and means of diversion, flow rate and/or volume, priority date, and place of use. Section 85-2-234(6), MCA.

¶30 For any new beneficial use or water right change of use application, a statement of claim is prima facie proof of its contents until the issuance of a final decree. Section 85-2-227(1), MCA. An objector may overcome this prima facie status with proof by a preponderance of the evidence that the claim does not accurately reflect historical use. *Curry*, ¶ 45 (citing *Nelson v. Brooks*, 2014 MT 120, ¶ 37, 375 Mont. 86, 329 P.3d 558).

¶31     PDC's overarching argument here is that it provided sufficient evidence to support its claims, that AMD did not overcome them, and the Water Court thus erred in making findings and conclusions to the contrary.

¶32     *Issue One:  Did the Water Court correctly decree PDC's service area?*

¶33     The Water Court ruled that PDC failed to show that it was entitled to a 7,072.53-acre service area because the record did not prove, by a preponderance, that PDC or its predecessors ever contemplated irrigating the proposed additional acreage.  The Water Court reasoned that the boundary of a service area is delineated by historical use, not by the scope of a delivery system.  Because nothing in the record indicated that Parrot Ditch was ever intended to be used or was actually used to irrigate the proposed additional acreage, the Water Court concluded that the boundaries for PDC's service area are more appropriately defined by the actual place of use for PDC's B and C Class shares, given PDC's articles of incorporation provide that the shares are appurtenant to specific tracts of land.[5]

¶34     PDC argues that the Water Court erroneously interpreted caselaw around service areas.  PDC contends that the Water Court's holding was rooted in a finding that PDC's water rights are appurtenant to shareholders' land despite the fact that a *water supply entity's* rights are not appurtenant to the land where they are used.  *See generally Bailey*; *Curry*; *In re E. Bench Irrigation Dist.*, 2021 MT 319, 406 Mont. 502, 501 P.3d 380*.*  In the

---

[5] The Articles of Incorporation specifically provide that Class B and C shares are appurtenant to the land where they are used, i.e., land above or below the Doherty Overflow in Section 18, Township 1 South, Range 4 West.

alternative, PDC asserts that the Water Court "misapprehended the evidence" that PDC introduced supporting its proposed service area.

¶35    A service area may be used to describe the place of use element of a water right for water supply entities because they generally do not own the land where their water rights are "actually" used. *Curry*, ¶ 41. The concept of service areas stems from *Bailey*, which found support for them—and for water supply entities generally—on the clear "public policy of this state to encourage these public service corporations in their irrigation enterprises." 45 Mont. at 177, 122 P. at 583. While public policy may generally favor the creation of more arable land, we have never held that the size of a delivery system dictates the scope of a service area. To the contrary: "a water user may not expand a decreed right by subsequently extending water use to additional lands not under actual or contemplated use at the time *the water was decreed*." *E. Bench*, ¶ 58 (citing *Quigley v. McIntosh*, 110 Mont. 495, 505, 103 P.2d 1067, 1072 (1940)) (emphasis in original).

¶36    We have held that irrigators may move acreage around within a larger service area when the exterior boundaries are supported by the historical record. *Curry*, ¶¶ 21–35. Although the scope of the supply entity's claimed service area in *Curry* was based on "the amount of land [its] entire infrastructure could potentially service, but had never historically serviced"—like PDC's proposed service area here—the company's bylaws "specifically contemplate[d] the movement of water"[6] within the claimed service area

---

[6] The Pondera County Canal and Reservoir Co. bylaws provided: "[T]he shares and water rights evidenced thereby shall become and forever be inseparably appurtenant to such lands, subject, nevertheless, to the power of the Board of Directors of this corporation, for good cause shown, at the request and with the consent of the owner thereof, to *make said certificate of stock appurtenant*

11

boundary. *Curry*, ¶¶ 14, 43. Further, in *E. Bench*, we determined that the scope of a service area for an irrigation district was dictated by patterns of historic use by individual landowners, not by the *projected* irrigable acreage included in a cost estimate and feasibility study. *E. Bench*, ¶¶ 43–44, 80–82. Unlike both *Curry* and *E. Bench*, PDC did not present any evidence indicating that PDC or its predecessors-in-interest ever contemplated irrigating the additional acreage from Parrot Ditch. The only material evidence that PDC provided included aerial photographs and expert testimony indicating the land has been irrigated. However, PDC conceded that the land could have been irrigated from another source.

¶37 PDC disputes the Water Court's reference to the language in its bylaws defining Class B and C stock as appurtenant to the land where the water is used. The assertion stems from our rulings that water supply entities' rights *are not* appurtenant to the land where they are actually used. *See generally Bailey; Curry; E. Bench*. Whether PDC's rights are appurtenant to its delivery system or the land is irrelevant. The Water Court did not rule, as PDC states, "that the boundaries of PDC's service area were constrained by the concept of appurtenance." Rather, it looked to the record to determine if PDC had presented evidence bearing on whether the proposed service area was "actual or contemplated use at the time *the water was decreed*." *E. Bench*, ¶ 58 (emphasis in original). PDC's Articles of Incorporation were merely indicia that the additional acreage was beyond the scope the Company contemplated at its outset.

---

*to other land which is so located that the Irrigation System as then and now constructed can readily and efficiently serve the same*." *Curry*, ¶ 9 (emphasis added).

¶38 Place of use is one of several elements that the Water Court must ultimately decree for every water right in Montana. Section 85-2-234(6)(e), MCA. When an element of a water right is in dispute, isolating the original appropriator's intent aids in determining the proper scope of the right—this is fundamental to Montana water law. *See generally Bailey; Curry; Nelson; E. Bench; Bureau of Land Mgmt. v. Barthelmess Ranch Corp.*, 2016 MT 348, 386 Mont. 121, 386 P.3d 952. The Water Court did not err in concluding that the scope of PDC's place of use must reflect historical use.

¶39 Alternatively, PDC contends that the Water Court "misapprehended the evidence" because it misstated expert witness Deborah Stephenson's testimony. Stephenson testified that she believed a 16,057-acre service area would be appropriate based on the reach of Parrot Ditch. She further testified that she believed 7,072.53 acres were historically irrigated with PDC water rights. The Water Court found that "PDC offered an exhibit that consists of a map depicting its proposed service area, which Stephenson testified covers approximately 7,072 acres." PDC is correct that the Water Court misstated Stephenson's testimony because the service area she proposed was 16,057 acres. Regardless, the Water Court did not misapprehend the *effect* of Stephenson's testimony. The Water Court concluded that "[t]he claim files demonstrate PDC supported the amendments to 6,710.78 acres with evidence," which supported a service area generally. Further, the Water Court reasoned that PDC "did not prove the existence of a service area boundary larger than 6,710.78 acres *within which water delivered to its shareholders historically was moved around from year to year*." (Emphasis added.) The Water Court reached this conclusion

13

because the evidence was deficient, which was wholly unrelated to Stephenson's testimony. We are not convinced that the findings were clearly erroneous.

¶40 The Water Court did not err in applying the facts to the law. PDC is entitled to a 6,710.78-acre service area.

¶41 *Issue Two: Did the Water Court correctly decree PDC's Townsend and Methodist rights?*

¶42 The Water Court modified both the Townsend and Methodist rights. The priority date for the Methodist right was modified to January 16, 1883. The Townsend right flow rate was changed from 500 cubic feet per second (cfs) to 250 cfs, and its priority date was modified to March 31, 1895. The Water Court determined that AMD overcame the prima facie status of PDC's Townsend and Methodist rights because *Carney*, as decided in 1926, did not adjudicate water rights, and thus did not decree the priority date and flow rate elements PDC argued for below. The original appropriators' intent, the chain of title, and ditch capacity all helped AMD satisfy its burden to prove that PDC's rights should be modified.

¶43 PDC argues that the Water Court erred in concluding that *Carney* did not adjudicate water rights and contends that it was error not to consider the "evidentiary weight" of *Carney* as having established the prima facie status of its claim. PDC contends the findings in *Carney* should have been presumed correct, and AMD should have been required to put on additional evidence proving otherwise.

¶44 At the outset, we must address PDC's misconstruction of the appropriate burdens of proof. AMD was not required to prove on a preponderance of *other* evidence that the

14

factual findings in *Carney* were unsubstantiated. Rather, the sum of AMD's evidence was required to show that PDC's entitlement is something other than it claims. While AMD's interpretation of *Carney* was one such piece of evidence, the Water Court determined that additional evidence also helped to satisfy its burden. We thus begin with *Carney* but emphasize that it is not the threshold issue.

¶45 The Water Court's conclusions regarding *Carney* were correct. "[W]here a judgment is susceptible of two interpretations the one will be adopted which renders it the more reasonably effective and conclusive and which makes the judgment harmonize with the facts and law of the case." *In re Quigley*, 2017 MT 278, ¶ 15, 389 Mont. 283, 405 P.3d 627.

¶46 PDC members in *Carney* raised their complaint under § 7152, RCM (1921) (now codified under § 85-5-401, MCA), and asked for an "adjudication of the several rights in the said Parrot Ditch." Significantly, § 7152, RCM (1921), prescribed procedures for determining ditch rights between corporate shareholders. The statute provided that, during the pendency of a dispute, a water commissioner could be appointed "to apportion and distribute the waters of said ditch, according to the rights of the respective owners, tenants in common, or stockholders during the pendency of the action." Section 7152, RCM (1921). A separate statute provided a procedure for adjudicating water rights disputes between different claimants in a single source. Section 7105, RCM (1921); *see also* Howard W. Heman, *Water Rights Under the Law of Montana*, 10 Mont. L. Rev. 13, 29 (1949) (describing § 7105, RCM, as "The basic method of protection of water rights in

Montana is by adversary proceedings between claimants in an action to determine the relative rights of all parties in the source of supply in question.").

¶47 As the Water Court reasoned, a controversy involving water rights would have been litigated under § 7105, RCM (1921). Such was not the case in *Carney*. Rather, *Carney* was litigated under § 7152, RCM (1921), and the conclusions of law accordingly focused specifically on the shareholder's ditch rights, describing the conversion of A to B and C Class stock; the practical and geographic distinctions between B and C Class stock; and the specific quantity of shares that each PDC shareholder was entitled to. However, as PDC notes, this fact alone does not necessarily mean that a ditch decree could not also adjudicate water rights. Nevertheless, we find that in this case, it did not.

¶48 PDC argues that it would be more reasonable to interpret *Carney* as a water rights dispute than a shareholder dispute because "there were competing third party interests to the waters being conveyed from the Jefferson River via the Parrot Ditch." PDC finds support for this "reasonable interpretation" in the fact that PDC moved for appointment of a water commissioner in *Carney*, arguing that they would not have done so "unless some of the *Carney* defendants were third parties who were not PDC shareholders bound by the terms of PDC's governing documents." The *Carney* decision itself disposes this theory because it lists both the PDC shareholders and defendants involved in the litigation. Every defendant was a shareholder in PDC. Moreover, the appointment of a water commissioner was specifically provided for by the shareholder ditch rights provisions; thus, it would have been reasonable to appoint one solely to enforce the respective ditch rights of PDC shareholders. Section 7152, RCM (1921). The dispute was litigated exclusively among

16

PDC shareholders. The litigants had mutual interests in the flow rate and priority date of the rights; thus, they were not litigated.

¶49 "'It is a fundamental principle of our jurisprudence that it is only against a party to the action that a judgment can be taken and that the judgment is not binding against a stranger to the action.'" *Pearson v. Virginia City Ranches Ass'n*, 2000 MT 12, ¶ 41, 298 Mont. 52, 993 P.2d 688 (quoting *Kessinger v. Matulevich*, 278 Mont. 450, 460, 925 P.2d 864, 870 (1996)). Given that third party rights were not involved in the *Carney* litigation, it would not comport with the facts or the law of the case to transpose them into *Carney's* ditch rights decree now. *Pearson*, ¶ 41. While a district court's factual findings are ordinarily entitled to significant weight, they are only entitled to weight where they are germane. *Carney's* factual findings are only relevant to establish that the decision did not involve third party interests putting the flow rate and priority date in dispute.

¶50 The Water Court did not err in interpreting the *Carney* decision. The Water court presumed PDC's claim was correct, then determined AMD met its burden to overcome this prima facie status based on *Carney's* factual findings and other evidence regarding intent, chain of title, and ditch capacity. The Water Court, for example, found that PDC's predecessors-in-interest were not incorporated until January 16, 1883, which was sufficient to overcome PDC's proffered January 24, 1880 Methodist right priority date. Additionally, the Water Court determined that PDC's 500 cfs Townsend right should be modified to 250 cfs because the only evidence provided concerning ditch capacity indicated Parrot Ditch was "bank full" when it carried 250 cfs.

17

¶51     Whether or not the Water Court correctly determined that AMD's evidence overcame the prima facie status of PDC's claim is a question of fact that we review for clear error. Because PDC does not contest any of the Water Court's factual findings, we are left with nothing more to analyze. There was substantial evidence to support the Water Court's conclusions. *Twin Creeks*, ¶ 21.

¶52     *Issue Three: Did the Water Court correctly decree PDC's Nolte right?*

¶53     The Water Court ruled that AMD overcame the prima facie status of the Nolte flow rate and, accordingly, modified it from 231.2 cfs to 100 cfs. The Water Court's decision was based solely on the Water Court's and PDC's failure to provide other water users notice of its amendment when it requested the Nolte flow rate be modified in January 1997. The Water Court ruled that, "[g]iven the importance of notice, AMD's lack of notice proof meets the standard necessary to overcome the flow rate in the Preliminary Decree abstract."

¶54     PDC argues that the Water Court erred in determining that PDC was required to notify affected water users about its January 1997 Nolte right flow rate amendment because the notice statute, § 85-2-233(6)(a), MCA, was passed *after* PDC requested the amendment, and the bill providing for it, Senate Bill (SB) 108, included a savings clause that effectively excepted the Nolte flow rate amendment.

¶55     AMD counters that notice to affected users was a requirement prior to the passage of SB 108 in 1997. AMD contends that, typically, an amendment like PDC's would have been filed as an objection to the Temporary Preliminary Decree in 1989, after which other water users would have received notice from the Water Court and had an opportunity to object. Because the Nolte amendment occurred roughly eight years after the Temporary

18

Preliminary Decree was issued, PDC argues that affected water users did not receive notice and accordingly did not have an opportunity to object at that time.

¶56 Rule 10 of the Montana Water Rights Adjudication Rules permits water rights claimants to amend their water right claims. Upon review of a motion to amend, the Water Court "will determine the notice required pursuant to § 85-2-233(6), MCA, and issue an appropriate order."

¶57 Section 85-2-233(6)(a), MCA, provides that, after the Water Court issues a temporary preliminary decree or preliminary decree, "notice must be published once a week for 3 consecutive weeks in two newspapers of general circulation in the basin where the decree was issued for . . . a motion to amend a statement of claim that may adversely affect other water rights . . . ."

¶58 Senate Bill 108 established the notice requirement under § 85-2-233(6)(a), MCA, and included a savings clause exempting "rights and duties that matured, penalties that were incurred, or proceedings that were begun before" the act was enacted. 1997 Mont. Laws, ch. 174, § 7.

¶59 There is no dispute that notice would have been required if PDC had sought its amendment after SB 108 was passed. The question, therefore, is whether PDC's January 1997 Nolte flow rate amendment was subject to a notice requirement otherwise.

¶60 PDC asserts that when the Legislature provides a savings clause it excepts from the new legislation matters that would otherwise be governed by the new law. *Fisher v. First Citizens Bank*, 2000 MT 314, ¶ 19, 302 Mont. 473, 14 P.3d 1228. In this case, there was a savings clause stating that the notice requirement under § 85-2-233(6)(a), MCA, did not

19

apply to proceedings that began prior to the date of enactment, which was after PDC filed the amendment. The Water Court concluded that the "importance of notice" was ample evidence to overcome the prima facie status of PDC's claim, but it did not provide any further analysis or discussion. While the Water Court cited *Montana Trout Unlimited v. Beaverhead Water Company* as supporting a notice requirement during the adjudication process generally, that case was decided well after the notice requirement was promulgated and it was squarely grounded in the 1997 law. 2011 MT 151, ¶ 21, 361 Mont. 77, 255 P.3d 179.

¶61 Nevertheless, the Water Court is correct that notice is fundamental to a fair adjudication of water rights. As we discuss below, PDC's amendment to the Nolte flow rate was a late self-objection that was proscribed by statute and should not have been approved without notice to parties whose rights were implicated by Temporary Preliminary Decree. The Water Court correctly held that the legal infirmity of the amendment was sufficient to overcome the prima facie status of the Nolte flow rate.

¶62 Since a statutory framework for water rights adjudication in Montana was first created, showing an absence of adverse effect on senior water users was a requirement to perfect an appropriation. *Quigley*, 110 Mont. at 505, 103 P.2d at 1072 (quoting § 7095, RCM (1935)). Notice was part and parcel to the adverse effect requirement, and it was incorporated into MWUA such that it was requisite to any new beneficial use permit or

water right change of use permit.  *Compare* § 7119, RCM (1921) *with* §§ 85-2-311, -402, MCA (1973).[7]

¶63    Likewise, since MWUA was passed in 1973, notice and a hearing were required for any objection or self-objection to a preliminary decree or temporary preliminary decree. Section 89-876, RCM (1973) (now codified § 85-2-233(5)(a), MCA).  When PDC requested the amendment to the Nolte flow rate, requests for public hearing had to be filed within 180 days after entry of a temporary preliminary decree or preliminary decree.[8] Section 85-2-233(2), MCA (1995).  The time period could be extended up to an additional 180 days.  Section 85-2-233(2), MCA (1995).  Once that time period expired, the Water Court was required to notify each party named in the decree that a hearing had been requested.  Section 85-2-233(4), MCA (1995).

¶64    Self-objections were the only statutory mechanism to amend one's own water right. However, the Water Court would allow late objections or amended pleadings when other water users were unaffected or when notice was provided to users who would be affected. *See, e.g.*, *In re Jefferson River Basin*, 1993 Mont. Water LEXIS 4, *12–*13 (Mont. Water Ct. 1993) ("Generally, issues concerning elements of a water right claim that are not raised by timely objection and noticed to other water users named in the Temporary Preliminary

---

[7] "The appropriator shall, as near as may be, give the names of all appropriators or claimants who have, or appear to have, rights in the source of supply, from which the appropriation is sought, and whose rights may be in anywise affected by the appropriation, and in the petition the petitioner shall be named as plaintiff, and all other parties as defendants."  Section 7119, RCM (1921).

[8] The 1997 amendments modified the statute to require any objections be filed within 180 days. 1997 Mont. Laws ch. 174.

Decree may not be raised by a late objection, amended pleading, or otherwise unless no other water users will be adversely affected or sufficient notice of such amendment is provided to those users who may be so affected."). The policy comported with statute because it ensured that other water users would not be adversely affected by a modification to a water right. *See Quigley*, 110 Mont. at 505, 103 P.2d at 1072; §§ 85-2-311, -402, MCA (1973).

¶65 SB 108 formalized the Water Court's policy regarding late objections and amended pleadings by providing a statutory mechanism and criteria for doing so, including the notice requirement under § 85-2-233(6)(a)(i), MCA, that PDC asserts it was not subject to here. The Water Court has since identified what types of amendments are *not* allowed under the existing statutory framework: "If a post-objection period motion to amend amounts to a disguised late objection, the motion is not within the scope of what the motion to amend statute allows." *In re Sieben Livestock Co.*, 2023 Mont. Water LEXIS 390, *7 (Mont. Water Ct. 2023). The Water Court's reasoning embraces the fundamental purpose of the notice requirement as it existed before and after 1997, which is to ensure water users are treated fairly and have recourse before their rights are affected. *In re Open Cross Ranch, Inc.*, 2019 Mont. Water LEXIS 7, *5-*6 (Mont. Water Ct. 2019).

¶66 PDC requested a change to the Nolte flow rate in a January 13, 1997 letter that PDC director John Kountz characterized as a "motion to re-open water claim," wherein he asked the Water Court to reopen his April 12, 1990 objection to the Nolte claim. PDC couched its request as a self-objection, which should have been subject to the same notice requirement as any other self-objection because it implicated other water rights.

22

Nevertheless, it was tentatively approved as a result of the Water Court's policy of approving certain statement of claim amendments.[9] The extent of the modification, combined with the fact that the request was made in a letter titled "motion to re-open water claim" rather than as a formal objection, as PDC had filed previously, suggests that the "amendment" was simply a disguised late objection. *In re Sieben Livestock Co.*, 2023 Mont. Water LEXIS 390 at *7.

¶67 We avoid statutory constructions that render any section of the statute superfluous or fail to give effect to all of the words used. *Mont. Indep. Living Project v. City of Helena*, 2021 MT 14, ¶ 11, 403 Mont. 81, 479 P.3d 961. Accepting PDC's argument would render the pre-1997 notice requirement superfluous, and it would not comport with the overall statutory scheme. The Water Court did not clearly err in concluding that AMD overcame the prima facie status of PDC's Nolte claim based on deficient notice. Because PDC does not dispute the Water Court's other factual conclusions, we affirm the Nolte decree.

## CONCLUSION

¶68 The Water Court did not err in decreeing PDC a 6710.78-acre service area because PDC failed to provide sufficient evidence supporting a larger service area. The Water

---

[9] The April 1, 1997 master's report recommending the modification states: "The changes recommended in this Master's Report are interlocutory as no Entry of Judgment has taken place and no final decree has been issued. *See generally Matter of Sage Creek Drainage Area*, 234 Mont. 243, 763 P.2d 644 (1988). Generally, a Court has plenary power over its interlocutory orders and may revise such orders when it is consonant with justice to do so. *Smith v. Foss*, 177 Mont. 443, 582 P.2d 329 (1978); 7 Moore's Federal Practice, para. 60-20, p. 242. In the event that other parties allege that they are entitled to some portion of the 9248 miner's inches of the October 15, 1891 Nolte Appropriation that was not claimed in the Temporary Preliminary Decree, or if it appears that the Parrot Ditch Company or its successors are not entitled to the full 9248 miner's inches [231.2 cfs] of the Nolte Appropriation that were not claimed, then this claim may be subject to further modification upon petition by an aggrieved party or on the court's own motion."

Court correctly determined that *Carney* did not adjudicate water rights and found that substantial evidence supported the Townsend and Methodist decrees. Finally, the Water Court correctly modified the Nolte flow rate to 100 cfs.

¶69    Affirmed.

                              /S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE